DELORES D. MOORE, Plaintiff-Appellee, *v.* REMINGTON ARMS COMPANY, INC., Defendant-Appellant.—(JOE LEWIS, d/b/a Lewis Reloader Supply, Defendant.)

Fourth District    No. 16876

Opinion filed October 15, 1981.

Fred B. Moore and Richard E. Stites, both of Livingston, Barger, Brandt, Slater and Schroeder, of Bloomington, for appellant.

Hull, Campbell, Robinson & Gibson, of Decatur (Jon D. Robinson, of counsel), for appellee.

Mr. JUSTICE LONDRIGAN delivered the opinion of the court:

On June 18, 1978, plaintiff, Delores Moore, attended a skeet-shooting competition at Chanute Air Force base in Rantoul, at which she used her Remington Model 1100 shotgun. After shooting approximately 25 shotgun shells, Moore loaded her gun with a blue Remington shell; upon firing at the next target, the gun exploded in her hands, causing severe injury to her left thumb and hand.

This suit against Remington Arms Company, Inc. (Remington), the manufacturer of the gun and shotgun shell, and against Joe Lewis, d/b/a Lewis Reloader Supply (Lewis), the retail seller of the gun, followed. The suit was grounded in strict liability. The third amended complaint, upon which the case was tried, alleged (1) that the gun was defectively designed (against Remington in count I and against Lewis in count III); (2) that the gun was defectively manufactured out of defective metal (against Remington in count II and against Lewis in count IV); and (3) that the shotgun shell was defectively manufactured (count V against Remington). Plaintiff sought compensatory damages based on these allegations. In count VI of her complaint, plaintiff sought punitive damages from Remington based upon its knowledge of prior similar explosions and thus its prior knowledge of the defective nature of the shotgun. The jury returned verdicts in favor of plaintiff and against Remington, awarding plaintiff $161,288.79 in compensatory damages and $85,000 in punitive damages. The jury absolved Lewis of liability.

The main thrust of this appeal by Remington attacks the punitive damages award and the trial court's related evidentiary rulings. Remington also challenges the awarding of compensatory damages but not the amount awarded.

Plaintiff, her husband James Moore, and the referee were present when the gun exploded, and they testified at trial. All three are experienced marksmen and gun owners. James Moore purchased the Model 1100 Remington shotgun for plaintiff on June 17, 1977, from defendant Lewis. At that time the gun was new and appeared to James Moore to be a standard Model 1100. The gun was used only by the Moores and exclusively for skeet shooting between its purchase and the explosion. Mr. Moore regularly cleaned and maintained the gun; when he cleaned the

gun earlier in the week of its explosion he noticed nothing irregular about it.

On June 18, 1978, plaintiff shot 25 targets, or one series or round, using red reloaded Winchester shells. That particular competition involved shooting at two targets consecutively that were thrown from different "houses." At the start of her second round plaintiff shot at the first target but the second target came out of the house broken. The rules of the game require that the referee give the marksman a replacement shell. Plaintiff and James Moore testified that the referee, Alan Barber, provided plaintiff with a blue Remington RXP shell. Barber could not remember the color of the shell he gave plaintiff but testified that the gun exploded when she fired it using the replacement shell. Barber was an arm's length away from plaintiff when she fired the gun, and it exploded into pieces.

Plaintiff said that her husband was reloading only red-colored shells at that time and that on the date of the explosion she had shot only red-colored Winchester shells. Referee Barber stated that the shell that he gave plaintiff had been taken by him from the vault of the gun club sponsoring the competition. Barber was an official of the gun club and testified that the vault contained only factory-loaded shells and no "reloads." He stated that the gun club was not allowed to sell or give out reloaded shells. Barber testified that at that time the gun club bought their shells from Lewis.

Shotgun shells purchased from manufacturers are called factory-loaded shells and may be fired without alteration; these shells have new cases. After a shell is fired, the shell case may be "reloaded." Much of the factual conflict in this case revolves around the nature of the shotgun shell in the gun when the accident occurred. Plaintiff's contention, as evidenced by the foregoing facts, was that she used a factory-loaded blue Remington shotgun shell. Remington's defense centered on the argument that the shell in the gun was an improperly reloaded shell and that the improper assembly of the shell by an unknown individual (either one of the Moores or the gun club), not the defective nature of the gun or shell, caused the explosion.

With the exception of the type of shell used, the events of the incident itself were undisputed by Remington. The controversy over whether the shotgun shell was a factory load or a reloaded shell drew an opinion from almost every witness. The shell fragment, purportedly from the shell that was in the gun at the time of the explosion, was introduced into evidence as plaintiff's exhibit No. 6. For comparison purposes, a factory-loaded shell was introduced as plaintiff's exhibit No. 7. Remington introduced testimony that the shell in the gun when the gun exploded was a reload.

*Plaintiff's Expert Witness*

Dr. David Levinson, plaintiff's expert witness, is a professor of metallurgy in the department of metals engineering at the University of Illinois, Chicago Circle Campus, and has a Ph.D in metallurgical engineering. Levinson took samples from the gun metal for a metallographic analysis; he photographed samples of the gun metal with a scanning electron microscope and performed hardness tests on it.

According to Levinson, the Moore gun barrel was made of a "free-machining" steel also commonly referred to as "resulphurized" steel, which is similar to "AISI 1140" steel. A free-machining steel is one alloyed with substances such as manganese or sulphur or sometimes lead to make it easier to handle in the manufacturing process. These substances are referred to as inclusions and are found in the metal; in general, inclusions appear as very small cracks, not visible to the naked eye but visible under a scanning electron microscope. Inclusions are deliberately present in the steel and are common to free-machining or resulphurized steels. Levinson stated that inclusions frequently are sites for the inception of cracks and that cracks may grow away from an inclusion. Upon examining the Moore barrel, Levinson found both inclusions and cracks.

In Levinson's opinion, AISI 1140, the metal used in the Moore barrel, is a relatively inexpensive steel and desirable from the standpoint of the manufacturer because, as a free-machining steel, it finishes easily. Levinson stated that he did not think that it was a good material from which to make shotgun barrels, however, because of its susceptibility to the initiation and growth of cracks at the sites of elongated manganese sulfide inclusions.

According to Levinson it is possible for not only the inclusions but the cracks to be present prior to the gun's leaving the hands of the manufacturer. Levinson stated that the cracks could result from proof testing which is done to the gun barrel by the manufacturer. A proof test is a test in which the barrel is subjected to a propellant charge that produces a pressure greater than normal. Levinson stated that the proof test performed by Remington on the guns will take one of three results: (1) A totally defective barrel with very large inclusions will break during proof testing; (2) a high quality gun barrel that is essentially free of inclusions or that has small and well distributed inclusions will be unaffected by the proof test; (3) an intermediate range of barrel that has elongated inclusions will not break during the proof testing, but the proof testing will make the gun more dangerous for subsequent use.

Levinson stated that the concentration of inclusions in free-machining steel varies among individual pieces cut. As a result, not all barrels made of 1140 free-machining steel will eventually explode; only guns that are

made from a batch of steel with a higher than average concentration of inclusions or that have longer inclusions near the firing chamber are subject to that danger. Thus one barrel might be defective but the next one adequate.

In discussing the explosion of a defective barrel, Levinson stated that the cracks in the barrel would grow over a period of time to the point where the next normal stress or factory load fired from the barrel would cause the barrel to explode.

Levinson compared the steel used in the Moore barrel with a steel called chrome molybdenum steel, also referred to as 4140. Levinson said that chrome molybdenum steel is almost free of inclusions and is not a free-machining steel. Levinson stated that he compared 4140 to the steel in the Moore gun because it is frequently cited as being an appropriate steel for firearms and is often used in their manufacture. Levinson testified that in his opinion resulphurized steel is a bad choice of metal for shotgun barrels and concluded that the Moore gun was unreasonably dangerous when it was manufactured and that the gun failed due to a metallurgical design mistake.

### Remington Committee Members

Robert Balaska, a design engineer for Remington, testified that he examined the Moore gun as part of a committee at Remington that looks at guns sent to the company to determine why they have failed. Balaska stated that in the preceding three or four months he had examined six to eight guns that looked like the Moore gun. Balaska knew of other situations where guns had exploded and injured persons but stated that the explosions were not similar to the Moore explosion. The conclusion of the committee was that the cause of the Moore gun explosion was a high pressure load round or defective ammunition. Balaska admitted that the report did not specifically mention hand-reloaded shells to be the cause.

James Stekl, another committee member, was permitted to testify over Remington's objection under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Stekl was supervisor of product services of the firearms for Remington and handled customers' complaints about firearms. Stekl testified that the committee reports stated that the gun damage was caused by defective ammunition. Stekl stated that if it were determined that the shell was a new Remington RXP shell, his opinion of the cause of the explosion would be the same. Plaintiff attempted to question Stekl regarding a list of prior explosions provided by Remington to plaintiff as answers to interrogatories. Stekl admitted having examined other Remington Model 1100 shotguns where persons had been injured but denied knowing of occurrences similar to the Moore explosion. Plaintiff's attorney then read the interrogatory answer in which Remington

admitted the existence of "similar occurrences" to the explosion in the instant case. During clarification, Stekl stated that prior to the Moore gun explosion he was unaware of any complaint of a gun failure due to inclusions in the metal. The Moore gun was made of the same metal that Remington has always used for Model 1100 shotguns.

Stekl conceded that Remington, in answer to interrogatories, had admitted receiving complaints about Remington RXP shotgun shells but noted that four complaints in all had been received about the shells and none of them was in any way related to high pressure in the shells.

### Remington's Evidence

Joe Lewis, former owner of Lewis Reloader Supply, testified that according to his records, the last time he made a sale to the gun club at Chanute Air Force base was February 24, 1975. Further, Lewis had no memory of any sale of supplies to the gun club in 1978 and had no record of such sale.

Phillip P. Johnson, supervisor of chemical and metallurgical control at Remington, is responsible for purchasing steel for the company and for insuring the quality of raw materials purchased by it. Remington has been using AISI 1140 modified steel in its Model 1100 shotguns since 1960. There has been no change in the specifications for the steel during that time, and the same steel is used in all shotgun barrels that Remington produces. The term "modified" after the number indicates that there is slightly more manganese and sulphur added to the steel than would be present in the "standard" 1140; Remington pays a slight premium price for this. Johnson acknowledged that chrome molybdenum steel does not have as many inclusions in it as AISI 1140 modified, but he denied that the presence of the inclusions weakens the barrel. Johnson admitted that chrome molybdenum was probably a better steel for use in shotgun barrels than AISI 1140 modified.

Johnson examined the Moore gun for metallurgical defects. His conclusion was that the cause of the explosion was a high pressure chamber burst, caused by pressure greater than that that would be produced by firing a normal factory-loaded shotgun shell. The committee at Remington believed that the cause of the explosion was most likely a hand-loaded shell.

Johnson had not seen the shotgun shell, plaintiff's exhibit No. 6, prior to trial. After examining the shell at trial, it was his opinion that it was a reloaded one. Further, assuming that that shell was in the gun at the time of the explosion, it was Johnson's opinion that the cause of the gun failure was extreme high pressure caused by the reloaded shell.

Assuming that a new Remington RXP factory-loaded shell was in the gun when it exploded, Johnson said that he would have to look for flaws

in the steel because a new factory loaded shell could never create sufficient pressure to cause an explosion. Johnson asserted that inclusions cannot cause the type of defects that result in explosions.

Kenneth Packer, a Ph.D in industrial engineering, is a consulting engineer and the founder of Packer Engineering Associates. The Moore gun was brought by Remington to Packer to determine the cause of the failure. When the test gun was substantially overloaded with too much gunpowder it blew up. Although Packer stated that after firing, the overloaded gun appeared identical to the Moore gun, he admitted on cross-examination that the test gun, which was introduced into evidence, exhibited less damage than the Moore gun. Nevertheless, Packer was convinced by the test he performed that the cause of the explosion of the Moore gun was a high pressure handload or reload. His opinion was based in part on the condition of the shell that he had been given. Both the damage to the crimp and the markings on the brass portion of the head of the shell were noted by Packer in support of his theory that the shell had been hand-loaded.

In discussing free-machining versus non-free-machining steel, Packer noted that free-machining steel allows for precise manufacturing, which is a safety feature. Free-machining steel also increases in strength with higher temperatures and is, in fact, a stronger steel in the range of temperatures which are created when a gun is fired. Packer examined shotguns made of both free-machining and non-free-machining steel, and it was his opinion that it was not an unreasonably dangerous practice to use 1140 modified in the manufacture of shotguns but to the contrary was an excellent practice. Packer denied that the inclusions make the barrel weaker and stated that for a factory-loaded round to cause a gun to burst, a crack or defect in the gun would have to go one-half to three-quarters of the way through the barrel.

Spencer Wildman, the chief process supervisor at one of Remington's plants, supervises engineers in control of the process of manufacturing ammunition. He had not seen plaintiff's exhibit No. 6 prior to trial but after examining the shell stated, to a reasonable degree of engineering certainty, that it was a reloaded shell. Wildman concluded that the damage to the shell was probably the result of an excessive high-pressure reload.

Wildman described the process at the Remington factory for loading Remington shells. There are several devices in the manufacturing process that insure that the correct amount of gunpowder is included in each shell. It is impossible for only one shell in a batch to contain twice the correct amount of powder. However, if the machine involved was maladjusted, a series of shells could be produced with a greater than normal load of powder.

Wildman has received consumer complaints with regard to Remington shells but has never received a complaint that a new Remington shell had too much gunpowder. Wildman knew of no one at Remington who had ever received such a complaint.

### Remington Employee as an Adverse Witness

Remington initially complains that its employee, James Stekl, was improperly required to testify as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Stekl was impeached by Remington's answers to plaintiff's written interrogatories in which Remington admitted that other Model 1100 shotguns had exploded in "similar occurrences" to that of the Moore gun. Had Stekl not been called under section 60, he could not have been impeached with Remington's answers to those interrogatories, as a party cannot impeach his own witness. (*Martin v. Brennan* (1977), 54 Ill. App. 3d 421, 425, 369 N.E.2d 601, 605.) Remington asserts that the interrogatory answers would not have been allowed into evidence but for Stekl's testimony. Remington's contention is that Stekl is not within one of the categories of witnesses eligible to be called under section 60. Section 60 provides in part:

> "Examination of adverse party or agent. Upon the trial of any case any party thereto or any person for whose immediate benefit the action is prosecuted or defended, or the *officers, directors, managing agents or foreman of any party to the action*, may be called and examined as if under cross-examination at the instance of any adverse party." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 110, par. 60.

Stekl was Remington's corporate representative at trial; he signed the written interrogatory answers on Remington's behalf. Stekl testified that his job was "supervisor of product services, firearms," and explained that it basically involved handling customers' complaints about firearms. Stekl asserted that he was not an officer, director, foreman, or managing officer of Remington and further stated that he supervised no employees. Stekl was a member of the committee that examines guns that fail.

Stekl was, at a minimum, Remington's agent. If not, he could not have properly signed the interrogatory answers in Remington's behalf. (Ill. Rev. Stat. 1979, ch. 110A, par. 213(c).) Stekl was essentially the head of a one-person department. His job responsibility and his presence as Remington's representative at trial support the trial court's determination that Stekl was a managing agent of Remington and thus properly called under section 60.

### Interrogatory Answers as an Admission of Knowledge

Plaintiff's claim for punitive damages rests largely on the interroga-

tory answers tendered to her by Remington, specifically those to questions 12 and 13. Interrogatory No. 12 asks:

> "Was any Model 1100 Shotgun of the type or model involved in the occurrence in question as described in the Complaint, involved in any similar occurrences as the one here at any time prior or subsequent to June 18, 1978."

Remington's answer was "Yes." Interrogatory No. 13 required specifics. It stated:

> "If the answer to the foregoing Interrogatory is the affirmative, state:
>
> a. The date or dates of such occurrences;
>
> b. The name and last known address of the person or persons suffering personal injury or property damage as a result thereof;
>
> c. The cause of each said occurrence;
>
> d. If the Defendant, REMINGTON ARMS COMPANY, INC., is uncertain as to the cause, its opinion as to the cause of said occurrence or occurrences;
>
> e. The person or persons having custody of the records, reports, or files of the occurrence or occurrences given in the answers to this Interrogatory."

Remington responded to interrogatory No. 13 with a list of 67 persons, their addresses, the date of the occurrence, and the "cause" thereof.

At trial, in examining James Stekl as an adverse witness, plaintiff asked him a series of questions regarding these interrogatories over continued objections by Remington. Upon being read interrogatory No. 12 Stekl said that he did not believe that there were any occurrences or explosions similar to that of the Moore gun before or after June 18, 1978. Plaintiff's counsel then read both the question and the answer to interrogatory No. 12. Eventually, Stekl admitted that he had signed the interrogatories in Remington's behalf and that the interrogatory in fact admitted the existence of similar occurrences. The only information received by the jury with regard to interrogatory No. 13, however, was that Remington's answer listed 67 persons; the causes of these "similar occurrences" were not explained at trial.

The main problem is not whether the answer to interrogatory No. 12 could be used to impeach Stekl; in light of Stekl's answers to plaintiff's counsel's questions, the interrogatory and answer constituted a prior inconsistent statement and were properly admitted as such. The problem in this case is whether the question and answer to interrogatory No. 12 constituted substantive evidence that Remington had knowledge of a defect in its guns prior to the explosion in this case.

■■ Prior similar occurrences are admissible for the purpose of establish-

ing knowledge on the part of a manufacturer that a defect in the product existed prior to the injuries in the litigated case. Proof of such knowledge served as part of the basis for the award of punitive damages in *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.

In *Moore* a can of Drano, a caustic drain cleaner, which had never been opened, exploded in the plaintiff's hands, causing her severe injury. In discussing the admission of prior similar occurrences, the appellate court stated:

> "The record reveals that the trial court limited evidence of prior accidents to explosion claims against defendants where there was no opening of the can or any extraneous matter added or anything done to it. The court not only rejected cases where water or some outside material was added to the can, it refused plaintiffs' request to allow evidence of prior spontaneous explosions which occurred after the Drano had been subjected to its normal use. Under these guidelines the plaintiffs introduced evidence of three prior accidents in which a Drano can which had not been opened exploded and after which a claim was made against Drackett." 116 Ill. App. 2d 109, 129, 253 N.E.2d 636, 645.

The trial court in *Moore* limited admissible instances of prior similar occurrences to those that clearly would have put the manufacturer on notice that a defect in the product existed.

Subsequently, in *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 440-41, 396 N.E.2d 534, 537-38, the supreme court expanded upon the requirements for the admissibility of prior similar occurrences in strict liability cases. In *Rucker* the plaintiff sought to introduce evidence of prior occurrences to establish the existence of a dangerous defect. (In *Rucker* there was no request for punitive damages.) The supreme court stated that in determining the admissibility of prior occurrences to establish the dangerousness of an item "[i]t need not be shown that the accidents occurred in an identical manner. Substantial similarity is all that is required." 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538.

■■ We find that interrogatory No. 12 was too generalized and vague to fulfill the "substantial similarity" requirement enunciated by the court in *Rucker*. The question placed no time limit on "similar occurrences," and thus Remington's answer could have included only incidents that occurred after the explosion in this case. Clearly, only prior occurrences are relevant to establishing plaintiff's claim for punitive damages. Further, the interrogatory makes no attempt to describe what the term "similar" means, and, as is made clear by Remington's answer, Remington did not interpret this question as limiting similar occurrences to those that had

similar causes. We note that Remington's answer to interrogatory No. 13, not in evidence, listed "high pressure reload" as the cause of 58 of the 67 occurrences and that all 67 occurred before June 1978.

The purpose of the admission of prior occurrences to establish punitive damages in products liability cases is to show that the manufacturer had or should have had knowledge of harm inflicted on consumers by its product and with flagrant indifference to public safety failed to warn consumers of or remedy the defect. There is nothing inherent in the answer given by Remington to interrogatory No. 12 that establishes that Remington had been put on notice of a defect and acted in disregard thereof. Guns are inherently dangerous instrumentalities. The mere fact that other guns had exploded does not, therefore, in and of itself support the existence of a defect. The information presented at trial from the interrogatories did not constitute an admission sufficient to establish knowledge of a defect in the gun metal. Plaintiff was certainly not bound by Remington's decisions regarding the causes of the prior explosions and could have tried to prove that one or more of the prior gun failures was caused by a defect in the gun metal or manufacturing. The failure to show that any of the causes listed by Remington were at odds with what actually occurred, or with what the person involved in the explosion believed occurred, further demonstrates plaintiff's inability to establish that Remington should have been put on notice of a defect in its guns by these prior explosions.

### Standard for Awarding Punitive Damages in Products Cases

Defendant asserts that the trial court erred in denying its successive motions for a directed verdict, judgment notwithstanding the verdict, and a new trial on count VI, plaintiff's claim for punitive damages. We have viewed the evidence in its aspect most favorable to plaintiff and agree that the trial court should have granted the motion for a directed verdict. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) This question requires us to discuss the evidence necessary to survive a motion for a directed verdict or a judgment notwithstanding the verdict on the issue of punitive damages in a products liability case. The facts presented by *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103, have become the standard by which claims for punitive damages are measured in Illinois. (*Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 409 N.E.2d 299.) The appellate court's decision in *Moore*, however, was based on an especially sympathetic set of facts: (1) the corporation's knowledge of the danger inherent in the product, (2) the failure to warn the public of that danger, and (3) notice to the corporation of prior claims of spontaneously exploding cans of Drano. Although *Moore* may represent a classic case in

which an award of punitive damages is proper, it would not be appropriate to require the facts in other cases to be as egregious as those presented by *Moore* to pose a jury question on the issue of punitive damages. The Illinois Supreme Court has not yet spoken on the proper standard to guide courts in awarding punitive damages in products liability cases; in its opinion in *Moore* the supreme court affirmed the appellate decision without addressing this issue. Several problems in applying the general test to claims for punitive damages in products cases show why a special standard is needed in this area of the law.

■■ The general purposes of punitive damages are to punish wrongdoers and to deter them and others from engaging in similar conduct. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359.) The goals are the same in the context of products liability, but the unique concern here is deterring manufacturers from placing dangerously defective products into the stream of commerce by making this unprofitable to an unpredictable degree. See generally D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257 (1976); *Wangen v. Ford Motor Co.* (1980), 97 Wis. 2d 260, 294 N.W.2d 437; *Sturm, Ruger & Co. v. Day* (Alas. 1979), 594 P.2d 38, *opinion on rehearing* (1980), 615 P.2d 621, *opinion on rehearing* (1981), 627 P.2d 204.

*Kelsay* expressed the general, traditional standard for awarding punitive damages:

> "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others [citation]."
> (74 Ill. 2d 172, 186, 384 N.E.2d 353, 359.)

The concept of awarding punitive damages in products cases is not without difficulty. Defendants in this area of litigation are generally manufacturers and frequently, as is the case here, large national concerns that command little sympathy from jurors. Plaintiffs in these cases, on the other hand, often have been injured severely, normally while exercising due care for their own safety. Furthermore, punitive damages are subject to abuse because they have little or no relation to the actual damages suffered by a plaintiff. See D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products* (Draft to appear at 49 U. Chi. L. Rev. 1 (1982)).

Illinois was in the vanguard in permitting punitive damages in *Moore*; at that time few courts had been presented with the question of punitive damages in products cases and only a handful had allowed them. (*Toole v. Richardson-Merrell, Inc.* (1967), 251 Cal. App. 2d 689, 60 Cal. Rptr. 398; *Roginsky v. Richardson-Merrell, Inc.* (2d Cir. 1967), 378 F.2d 832; D.

Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1261 n.12 (1976).) The tide has since turned: judgments for punitive damages are now routinely entered across the nation, and staggering sums have been awarded. (*Leichtamer v. American Motors Corp.* (1981), 67 Ohio St. 2d 456, 424 N.E.2d 568 ($1 million to one plaintiff and $100,000 to another); *Grimshaw v. Ford Motor Co.* (1981), 119 Cal. App. 3d 757, 174 Cal. Rptr. 348 ($3.5 million); *Gryc v. Dayton-Hudson Corp.* (Minn. 1980), 297 N.W.2d 727 ($1 million).) We cannot dismiss lightly either the general trend or the result of the trial court in this case. The supreme court recently spoke to the need for tight judicial control over awards of punitive damages:

> "Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." (*Kelsay*, 74 Ill. 2d 172, 188, 384 N.E.2d 353, 360.)

In the area of products liability the susceptibility to abuse, noted above, makes such control even more necessary. The Alaska Supreme Court, noting Professor Owen's suggestion that awards of punitive damages in products liability cases be scrutinized closely by the courts (D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1321 (1976)), explained:

> "[J]udicial scrutiny over the awards [of punitive damages] provides a partial justification for allowing such awards in the first place. The spectre of bankruptcy and excessive punishment can be in part dispelled to the extent that trial and appellate courts exercise their powers of review." *Sturm, Ruger & Co.*, 594 P.2d 38, 48.

Greater judicial control will be gained by clarifying the terms used in the general standard for punitive damages. Ascribing the human qualities of malice and wilfulness to corporate entities is often paradoxical; from his study of products cases Owen has isolated "the two predominant characteristics" of commercial misconduct that make appropriate an award of punitive damages:

> "The first is the manufacturer's lack of concern for the public safety, a spirit of utter indifference to whether the product might cause unnecessary injuries. The second characteristic is the flagrancy of this indifference as reflected by the extent of the manufacturer's awareness of the danger and its excessiveness, the over-all magnitude of the danger to the public, the ease of reducing the risk, and the motives and other circumstances attending the manufacturer's failure to reduce the risk." (D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1366 (1976).)

From these characteristics Owen derives the following standard to guide courts in awarding punitive damages in products cases:

> "Punitive damages may be assessed against the manufacturer of a product injuring the plaintiff if the injury is attributable to conduct that reflects a flagrant indifference to the public safety." (D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1367 (1976).)

This test does not depart from the current law on punitive damages but instead tailors the general standard to fit the unique area of products liability; the traditional test, which was formulated to remedy intentional torts by individuals and irresponsible and oppressive acts by governmental officials (D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1364-65 (1976)), fails to focus on a special concern in products cases, namely, the effects on the public safety of manufacturers' decisions regarding the production and marketing of goods.

We are therefore persuaded to adopt Owen's standard in reviewing this case (see *Leichtamer* (Owen's language adopted on review)) and will apply it to the facts presented here.

Plaintiff failed to introduce sufficient evidence that Remington's use of resulphurized steel in its shotgun barrels constituted manufacturer misconduct sufficient to support a jury verdict in her favor. Plaintiff enumerates evidence other than Remington's answers to the interrogatories that, she contends, supports her claim for punitive damages. Plaintiff relies in part on one bit of testimony by Stekl supposedly admitting that Remington had received complaints about the resulphurized steel. Stekl did not in fact say that; he answered merely that that sort of information was kept by the company in an office in Connecticut. Stekl denied receiving any complaints, other than plaintiff's, regarding the steel. Plaintiff also cites evidence pertaining to the type of steel used by Remington since 1960 in producing Model 1100 shotguns, the availability of stronger steel, and the cause of the Moore explosion.

■■ Phillip Johnson's testimony that chrome molybdenum was probably a better steel than the steel used by Remington establishes neither the unreasonably dangerous or defective nature of the metal used by Remington nor that Remington was aware of the existence of such defect. Once the existence of a defect and prior notice of that defect to the manufacturer has been established, the availability of a nondefective alternative is a factor to be considered in determining whether the manufacturer's failure to act constitutes sufficient misconduct to support a punitive damages award. (See *Grimshaw*; *Gryc*.) Nothing in Dr. Levinson's testimony that the metal was inadequate for its intended use establishes that Remington knew or should have known of the defective nature of the

gun metal. Although the testimony on these matters supports the jury's decision that a defect existed in the gun or shell or both, it fails to reflect Remington's flagrant indifference to the public safety.

### Compensatory Damages

Remington also attacks the sufficiency of the evidence presented on the compensatory damages claim, asserting that the evidence was also insufficient to survive its motion for a directed verdict under *Pedrick.* Plaintiff's evidence was sufficient to create a jury question regarding whether her injuries resulted from an unreasonably dangerous condition of the gun or shell present when the products left Remington's control. *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103; *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401; *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.

■■ In reviewing the evidence, Remington ignores the testimony of the occurrence witnesses about the incident itself. The very nature of the occurrence implies the existence of a dangerous defect in either the gun or the shell. With regard to the shell, the Moores testified that the shell was a blue Remington shell, and Alan Barber stated that it was a factory-loaded shell. Remington's own committee report found that the explosion was caused by defective ammunition. Even in the face of the greater number of Remington witnesses who testified that the shell was a reloaded one, a jury question was created by the testimony of the Moores and Barber.

Remington attempts to separate count I from count II and distinguish between design and manufacturing defects in the shotgun. In this case the evidence was not so distinct. Although Dr. Levinson's opinion was that the defective nature of the metal was a metallurgical design defect, he also testified that forging of the metal into bars and the proof testing of the guns by the manufacturer exacerbated the defects.

Remington attacks Levinson's credibility as an expert witness, asserting that he was not as qualified as Dr. Packer. Levinson admitted that he had never previously worked on metals involving firearms; he was, however, an expert in metallurgy and clearly qualified to testify as an expert in this area. Any distinction between Dr. Levinson's and Dr. Packer's credentials affected only the weight to be given their testimony by the jury and not the sufficiency of the testimony.

■■ Remington's final argument is that evidence of its net worth was improperly admitted into evidence. Clearly, the financial condition of a corporate defendant is relevant in products liability cases where punitive damages are sought. (*Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 135, 253 N.E.2d 636, 648, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.) The assistant treasurer of Remington testified that Remington's net worth

immediately prior to trial was $150 million. This evidence was properly admitted, and although Remington argues that it was prejudicial to the determination of compensatory damages, it does not argue that the amount awarded was excessive. We find no error in the admission of this testimony.

For the foregoing reasons, we affirm the award of compensatory damages and reverse the punitive damages award.

Affirmed in part, reversed in part.

TRAPP, P. J., and GREEN, J., concur.