LAWRENCE BAIER, Plaintiff-Appellee and Cross-Appellant, v. BOS-TITCH, a Division of Textron, Inc., Defendant-Appellant and Cross-Appellee (Park Construction Company, Third-Party Defendant).

First District (4th Division)   No. 1—92—1267

Opinion filed February 11, 1993.

Hardesty, Wolf & Walkowicz, of Chicago (Ralph C. Hardesty and Victoria A. Walkowicz, of counsel), for appellant.

Richard J. Ramello, of Storino, Ramello & Durkin, of Rosemont, for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Lawrence Baier, filed a product liability action to recover damages for an injury to his knee allegedly caused by a defectively designed pneumatic nailer manufactured by the defendant Bostitch, a division of Textron, Inc. (Bostitch). The jury returned a verdict in favor of the plaintiff and against Bostitch in the amount of $314,200, which was reduced by 40% attributable to the plaintiff's fault. The trial court entered a judgment for $188,500 plus costs for a total of $190,165.82.

On appeal, the defendant contends that the trial court erred in denying its motion for judgment notwithstanding the verdict. Alternatively, the defendant contends that the jury verdict was against the manifest weight of the evidence. The defendant further contends that the verdict was excessive, that the court erred in admitting evidence of other accidents and that the court erred in denying the defendant's motion for summary judgment on the issue of punitive damages. Finally, the defendant contends that the jury was improperly instructed and that the court abused its discretion in awarding witness and mileage fees.

The tool which is the subject of this lawsuit is the N16 pneumatic nailer, a power tool which uses air pressure to drive nails out of a magazine into the object to be nailed. According to the testimony presented at trial, the nailer was available with either a contact trip mechanism (N16CT) or a sequential trip mechanism (N16). The difference between these two models is significant to the issues raised on appeal. In order to fire a contact trip nailer, the operator must depress the contact trip on the nose of the tool and press the trigger. When those two functions are performed, the tool will fire a nail. With a contact trip nailer, it does not matter in which order the two functions are performed. With a sequential trip nailer, the operator must first depress the nose, then pull the trigger. The plaintiff was using a contact trip nailer (N16CT) at the time he was injured.

The plaintiff testified that on November 15, 1983, he was 23 years old and had been working for Park Construction Company[1] for approximately six months. He was also pursuing a degree in finance at that time. The plaintiff testified that his employer, Peter D'Angelo, instructed him on the proper use of power tools. For each power tool, he was shown the tool's safety devices and was taught how to operate the tool and how to turn it on and off. The plaintiff recalled that D'Angelo told him that if any problems occurred with the pneumatic nailer, he was to unplug it from its power source before attempting corrective measures. D'Angelo instructed the plaintiff to take his finger off the trigger whenever he was not in the act of nailing.

At approximately 10:30 a.m. on the day of the accident, the plaintiff was using the nailer to place nails in plywood at 8- to 10-inch intervals. He had been using the nailer for that purpose since 8 o'clock that morning. As the plaintiff was moving along with the nailer, the air hose attached to the nailer became stuck and would not slide along. The plaintiff testified that when he "tried to stand up and free it *** [t]he gun brushed my right pant leg and shot a nail into my knee." No one other than the plaintiff witnessed the accident. The plaintiff did not know whether he had depressed the finger trigger at the time of the accident and was not certain whether the nose trigger was depressed when it brushed against his knee. The plaintiff testified that he had no reason to believe that

---

[1]Park Construction Company was brought into this lawsuit as a third-party defendant. The jury found no liability on the part of Park Construction Company and it is not a party to this appeal.

there was either a drop or surge in air pressure at the time of the accident. He thought that it was necessary to hit the nailer "flat on the surface" in order to fire a nail.

The plaintiff was taken by ambulance to the hospital emergency room where a 2½-inch nail was removed from his right knee. The plaintiff testified that this was a very painful procedure. Because the nail had been coated with adhesive, arthroscopic surgery was performed to clean out the adhesive and to debride the cartilage inside the knee. Following surgery, the knee was swollen and the plaintiff suffered scars around his kneecap. The jury was allowed to view the scarring.

In April 1984, a second arthroscopic surgery was performed to debride cartilage in the plaintiff's knee. He was required to walk on crutches for about four weeks following each surgery.

The plaintiff testified that he feels pain under his kneecap and that kneeling or doing household chores causes this pain. The plaintiff stated that he has good days and bad days, but that the knee causes pain every day.

The deposition testimony of Dr. Michael Gitelis, the plaintiff's treating physician, was read to the jury. According to Dr. Gitelis, the injury to the knee was permanent and would cause pain in the future. The plaintiff suffers disability in the sense that his activities are limited because of the pain caused by the injury. Gitelis testified that the plaintiff was injured in the intercondylar notch, which is the groove on which the kneecap slides. Gitelis stated that the plaintiff was experiencing grinding in the patellar femoral groove and that the cartilage in the knee was damaged. Testing detected weakness in the injured knee.

Gitelis further stated that the plaintiff was able to walk normally and suffered no nerve or vascular damage. The plaintiff was released from Gitelis' care in March of 1985 and did not return until May of 1991, when he was evaluated for purposes of the trial.

The plaintiff presented hospital and doctor bills totaling $10,400 and calculated his lost earnings to be $31,200.

Gary Hutter, an engineer, testified as an expert witness for the plaintiff. According to Hutter, the design of the contact trip pneumatic nailer rendered it unreasonably dangerous when used in its intended manner. According to Hutter, the design of the trigger mechanism allowed the tool to actuate with very minimal amounts of force being exerted on the nose, thereby creating a "hairlike" trigger. Hutter stated that it became a habit with workers to keep the trigger depressed while moving the nailer along. While the

nailer is depressed, a nail could be discharged accidentally simply by bumping the nose of the tool. Hutter explained that the sequential trip nailer presented a safer design because it was necessary for the operator to first depress the nose, then pull the trigger. Hutter testified that with the sequential trip nailer "you don't get in the habit, first of all, of walking around with the trigger pulled, and if you did for some reason walk around with the trigger pulled and you accidentally bumped into that *** [the tool would] not discharge a nail."

Hutter further testified that the contact trip nailer did not comply with the safety standards promulgated by the Industrial Stapling and Nailing Technical Association (ISANTA), of which the defendant was a member. Section 3.3.3 of the ISANTA guidelines states that the contact trip shall prevent the tool from discharging under its own weight. Hutter testified that the nailer in question would discharge under its own weight over the expected range of operating pressures. Hutter stated that air compressors cycle on and off, and that the nailer would become more likely to accidentally actuate when the air pressure supplied to the tool decreased as pressure in the compressor tank bled down.

Hutter testified that in his opinion there were ways to make the contact trip nailer safer. A stiffer spring could have been incorporated into the contact trip mechanism, requiring the operator to use more force to actuate the tool. Also, a pneumatic timer could have been installed to prevent the inadvertent discharge of nails after a certain number of seconds had passed. Hutter further stated that if the width of the nailer were increased or the weight of the nailer decreased, it would be less likely to discharge a nail when the contact trip was slightly depressed. Hutter testified that all of these safety measures were feasible based on a reasonable degree of engineering certainty. Hutter also stated that in his opinion a warning label should have been placed on the tool cautioning the operator to read the manual first and further warning the operator not to walk around with the trigger depressed.

The plaintiff presented the evidence deposition of Peter A. Readyhough, the defendant's supervisor of industrial product design during the project engineering and manufacturing stage of the contact trip nailer. In an internal company document, Readyhough stated that one of the disadvantages of the contact trip design was that the "[o]perator's usual habit of using and carrying tools with the trigger held actuated produces the possibility of driving a fastener into an object struck by mistake."

The plaintiff also called Robert D. Olmstead, the defendant's director of product engineering, as a witness. Olmstead testified concerning the defendant's patent application for the sequential trip nailer. In the application, the defendant recognized that the most common instance of inadvertent actuation occurs when an operator holding the tool in his hand with the trigger depressed accidentally engages the contact trip with an object other than the intended work piece.

The record shows that following the development of the sequential trip nailer, the defendant discontinued sales of the contact trip model. However, the contact trip nailer was reintroduced into the marketplace in response to demand for a faster tool allowing increased productivity. The record further shows, through the defendant's answers to interrogatories, that the defendant was aware of injuries that had occurred to persons using the contact trip nailer.

Prior to trial, the defendant made an unsuccessful motion *in limine* to preclude the testimony of an individual who had been injured while working with a contact trip nailer manufactured by the defendant. The jury was therefore allowed to hear the testimony of Douglas Williams, who was injured when a co-worker accidentally hit Williams in the head with a nailer, causing a nail to discharge into his brain. The jury was allowed to hear, over the defendant's objection, alleged admissions made by the defendant in answers to interrogatories filed in a case litigated in Alabama. Like the situation with Douglas Williams, the Alabama case involved another person shooting a nail into the injured person's body.

Peter D'Angelo, the plaintiff's employer, testified that he showed the plaintiff how to use the contact trip nailer and specifically instructed him to unplug the tool from its power source if there were any problems.

On behalf of the defendant, engineer Robert Olmstead testified that none of the design changes advanced by the plaintiff's expert witness were feasible or practical. Olmstead testified that warnings concerning the dangers associated with the contact trip nailer are included in the owner's manual packaged with the tool. According to Olmstead, the contact trip nailer was produced in response to customer demand and is used for "bump firing," a procedure in which the operator depresses the trigger and bumps the nose of the tool along the work piece, driving nails in close proximity to one another. At the time of trial, the defendant sold nine contact trip nailers for every one sequential trip model. Olmstead testified concerning the design and testing of the contact trip nailer.

Irving F. Hazard, a consulting engineer, testified that in his opinion the contact trip nailer was not unreasonably dangerous in manufacture, design, or warnings.

The jury awarded the plaintiff $140,000 for disability and disfigurement, $143,000 for pain and suffering, $10,400 for medical expenses and $20,800 for lost earnings for a total of $314,200. This was reduced by 40% attributable to the plaintiff's fault for a total award to the plaintiff of $188,520 plus costs.

The facts concerning the jury instructions and the witness fees will be set forth later in connection with our discussion of those issues.

The defendant first contends that the trial court erred in denying the defendant's motion for a judgment notwithstanding the verdict. Alternatively, the defendant contends that the jury's verdict in favor of the plaintiff was against the manifest weight of the evidence.

A judgment notwithstanding the verdict should be entered only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) A motion for a judgment notwithstanding the verdict presents a question of law and will be granted only if there is a total failure or lack of evidence to prove any essential element of the plaintiff's case. *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 311, 45 N.E.2d 665.

A plaintiff seeking recovery on the basis of strict liability in tort is required to plead and prove that his injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed when the product left the manufacturer's control. (*Broussard v. Houdaille Industries, Inc.* (1989), 183 Ill. App. 3d 739, 743, 539 N.E.2d 360.) Proof of an unreasonably dangerous design may be shown by the availability and feasibility of alternate designs at the time of the product's manufacture, or by proof that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or government regulation. *Anderson v. Hyster Company* (1979), 74 Ill. 2d 364, 368, 385 N.E.2d 690.

The defendant argues that the gist of the defendant's theory at trial was that the contact trip nailer was defectively designed because it could be subject to "inadvertent actuation." The defendant

maintains that the evidence did not support this theory because it demonstrated that the nailer could only be activated when the operator depressed both the finger trigger and the contact trip. According to the defendant, because the nailer performed as expected in light of its nature and intended function, it was not shown to be unreasonably dangerous. The defendant further maintains that there was no evidence to support the plaintiff's theory that a drop in air pressure would make the nose trigger act like a "hair trigger." Also, the defendant argues that the failure to include warnings on the tool did not make it unreasonably dangerous where such warnings were contained in the owner's manual and where the plaintiff had actual knowledge of the dangers associated with the contact trip nailer.

■■ In our view, the plaintiff presented sufficient evidence, summarized at length above, to avoid the defendant's motion for judgment notwithstanding the verdict. Although a manufacturer does not have a duty to design a product that is totally incapable of causing injury, it must design the product so that the user is not subject to an unreasonable risk of harm. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368.) The plaintiff presented evidence that the contact trip mechanism activated with very slight pressure and that safer designs were feasible. Evidence was also presented that the tool did not comply with ISANTA guidelines which provided that the contact trip should prevent the tool from operating under its own weight. Furthermore, the plaintiff presented evidence that the defendant knew of an operator's tendency to carry the tool with the trigger depressed, but did not place a warning label on the tool. Viewed in its aspect most favorable to the plaintiff, we cannot conclude that the evidence so overwhelmingly favored the defendant that no contrary verdict could stand.

Alternatively, the defendant contends that the jury's verdict was contrary to the manifest weight of the evidence. A verdict will be found to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based on any of the evidence. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969.) A new trial will not be granted merely because the evidence is conflicting. *Villa*, 202 Ill. App. 3d 1082, 560 N.E.2d 969.

In the case at bar, the jury was presented with lengthy and conflicting testimony by several expert witnesses. The defendant's argument is essentially that the jury made a mistake in accepting the

testimony of the plaintiff's witnesses and rejecting that of the defendant's witnesses. As stated above, this is not a sufficient basis upon which to overturn a jury's verdict.

The defendant next contends that the jury's award was excessive and that this court should order a remittitur. Specifically, the defendant maintains that the award of $140,000 for disability and disfigurement and the award of $143,000 for pain and suffering were based on insufficient evidence.

■ Damages are for the jury to determine. (*Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 1076, 436 N.E.2d 623.) A jury's verdict will not be determined to be excessive unless it is shown that the verdict resulted from passion or prejudice, or where the amount is so large as to shock the judicial conscience. *American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 488, 511 N.E.2d 1206.

In the case at bar, the plaintiff testified concerning the pain and suffering caused by the injury and by the two surgeries necessary to repair the damage to his knee. The jury was given the opportunity to examine the scars on the plaintiff's knee. Dr. Gitelis, the plaintiff's treating physician, testified that the plaintiff suffered disability in the sense that his activities were limited because of pain and that the condition was permanent. The plaintiff stated that he suffered pain under his kneecap every day. We believe that this testimony provided a reasonable basis for the jury's award and accordingly find no basis upon which to order a remittitur.

The defendant next contends that the trial court erred in allowing the plaintiff to introduce evidence of other accidents involving the contact trip nailer. The evidence in question consisted of the testimony of Douglas Williams and the alleged admissions made by the defendant in its answers to interrogatories filed in an Alabama lawsuit.

Evidence of prior occurrences may be admissible to establish the dangerousness of a product for purposes of strict liability. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 114, 499 N.E.2d 1373.) To be admissible, prior accidents must be substantially similar to the accident in question; however, they need not be identical. (*Ballweg*, 114 Ill. 2d 107, 499 N.E.2d 1373.) The determination of similarity between occurrences must be made by the trial court within the exercise of its sound discretion. *Bass v. Cincinnati, Inc.* (1989), 180 Ill. App. 3d 1076, 1081, 536 N.E.2d 831.

■ The defendant argues that the other accidents were not substantially similar to the one at bar because they did not involve

situations where a person inflicted the injury upon himself while using the nailer. Rather, in both of the other incidents, a co-worker of the injured party was handling the nailer when it accidentally discharged. We do not believe that this distinction precludes a finding that the prior accidents were substantially similar to the one before us. The evidence showed that in each of the prior accidents, as in the instant one, the nailer was held with the finger trigger depressed and fired a nail when it accidentally came into contact with a person's body. Under these circumstances, we cannot conclude that the trial court erred in ruling that evidence of the prior accidents was admissible.

The defendant next claims that the trial court erred in denying its motion for summary judgment on punitive damages prior to the start of trial. The defendant asserts the effect of denying the motion was to allow the plaintiff to introduce evidence of bad conduct, prior accidents, and the net worth of the defendant. According to the defendant, although the jury did not award punitive damages, the fact that it was allowed to hear evidence relating to the issue of punitive damages affected the award of compensatory damages.

The general purposes of punitive damages are to punish wrongdoers and to deter them and others from engaging in similar conduct. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353.) In a product liability case, the goal of awarding punitive damages is to deter manufacturers from placing dangerously defective products into the stream of commerce by making it unprofitable to an unpredictable degree. (*Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 1113, 427 N.E.2d 608.) The court in *Moore* considered the following factors in evaluating commercial misconduct and the propriety of granting an award of punitive damages:

" 'The first [characteristic] is the manufacturer's lack of concern for the public safety, a spirit of utter indifference to whether the product might cause unnecessary injuries. The second characteristic is the flagrancy of this indifference as reflected by the extent of the manufacturer's awareness of the danger and its excessiveness, the over-all magnitude of the danger to the public, the ease of reducing the risk, and the motives and other circumstances attending the manufacturer's failure to reduce the risk.' " (*Moore*, 100 Ill. App. 3d at 1114, 427 N.E.2d at 617, quoting Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1366 (1976).)

The *Moore* court concluded that punitive damages are proper where the defendant's conduct reflects a flagrant indifference to the public's safety. *Moore*, 100 Ill. App. 3d at 1115, 427 N.E.2d at 617.

Summary judgment is proper only when an issue is determinable solely as a question of law. (*Sidwell v. Sidwell* (1975), 28 Ill. App. 3d 580, 583, 328 N.E.2d 595.) It is therefore a remedy to be awarded with some caution so as not to preempt the right to a trial by jury or the right to fully present the factual basis for a case where a dispute over a material question of fact may exist. (*Lumbermens Mutual Casualty Co. v. Poths* (1968), 104 Ill. App. 2d 80, 87, 243 N.E.2d 40.) Summary judgment is appropriate only where the pleadings, depositions, affidavits and admissions on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *Continental Mobile Telephone Co. v. Chicago S M S A Limited Partnership* (1992), 225 Ill. App. 3d 317, 322, 587 N.E.2d 1169.

■ In arguing that the court erred in denying summary judgment in its favor on the punitive damages issue, the defendant focuses on the evidence presented at trial and asserts that the plaintiff failed to present evidence to support its allegations that the defendant acted with reckless disregard of its duty to design a product that was reasonably safe. The record, however, reveals that the depositions and admissions on file prior to trial do contain evidence supporting the plaintiff's allegations. The patent application for the sequential trip nailer addressed the dangers of inadvertent actuation associated with the contact trip nailer. Deposition testimony by Peter Readyhough established that the defendant had knowledge of the operator's "habit" of carrying the tool with the finger trigger depressed. The defendant's answers to interrogatories showed that the defendant had knowledge of substantially similar prior accidents suffered by workers who used the contact trip nailer. In our view, there were sufficient questions of fact to support the trial court's decision to allow the jury to consider the issue of punitive damages.

The defendant next contends that the trial court erred in giving certain instructions requested by the plaintiff and excluding others requested by the defendant. The defendant maintains that the jury should not have been instructed on OSHA regulations, on disfigurement as an element of damages, and on whether the defendant's due care constituted a defense. The defendant further maintains that the court erred in refusing to give non-Illinois Pattern Jury In-

structions on the feasibility of alternate designs and the manufacturer's duty regarding the safety of its product.

Generally, the standard for determining the adequacy of jury instructions is whether the instructions were sufficiently clear to avoid misleading the jury, while fairly and correctly stating the law. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1087-88, 560 N.E.2d 969.) A new trial will not be granted unless it is shown that faulty instructions clearly misled the jury and resulted in prejudice to the appellant. *Villa*, 202 Ill. App. 3d 1082, 560 N.E.2d 969.

The first instruction objected to by the defendant is Illinois Pattern Jury Instruction, Civil, No. 60.01 (2d ed. 1971) as modified (IPI Civil 2d No. 60.01). The instruction stated:

"There was in force in the United States at the time of the occurrence in question a certain administrative regulation which provided that:

'All pneumatically driven nailers, staplers, and other similar equipment provided with automatic fastener feed, which operate at more than 100 p.s.i. pressure at the tool shall have a safety device on the muzzle to prevent the tool from ejecting fasteners, unless the muzzle is in contact with the work surface.'

If you decide that a party violated the regulation on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent or the product unreasonably dangerous before and at the time of the occurrence."

The defendant contends that the trial court erred in giving the instruction because OSHA regulations apply only to employers and not manufacturers. The defendant maintains that the jury may have considered lack of compliance with this standard separately from the other evidence concerning the dangerousness of the product. The trial court overruled the defendant's objection to the instruction, stating that OSHA sets an industry safety standard which can be used to determine whether or not the product is unreasonably dangerous.

■ Even if we were to accept the defendant's argument that the instruction in question should not have been given, we do not believe that a new trial is warranted. The jury was fully instructed as to both parties' theories of the case. It heard lengthy and detailed testimony concerning the design and manufacture of the con-

tact trip nailer. Under the circumstances presented here, we do not believe that this single instruction could have resulted in prejudice to the defendant.

■ The defendant next asserts that the trial court erred in including the element of disfigurement, along with disability, as an item of damages. No authority is cited to support this argument. The defendant merely states that the plaintiff suffered only minor scarring and that the evidence was therefore insufficient to support a claim for disfigurement. The plaintiff responds that the jury, which observed the plaintiff's knee, was entitled to determine the proper amount of damages warranted by the scarring. We agree and decline to reverse on this basis.

■ The defendant's next contention is that the trial court erred in giving IPI Civil 3d No. 400.10, which states that "[i]f you decide that the plaintiff has proved all the propositions of his case, then it is not a defense that the condition of the product could not have been discovered by the defendant or that care was used in the manufacture of the product." (IPI Civil 3d No. 400.10 (1992).) The defendant argues that the record "is totally devoid of any evidence or argument on these topics" and that the "prejudicial effect is obvious." The plaintiff responds that Robert Olmstead, the defendant's engineer, testified as to the defendant's extensive testing processes and as to the developments and new materials in manufacturing processes. The plaintiff argues that the effect of that testimony was to impress upon the jury that if there was a defect in the product, it could not have been discovered. We agree that the testimony in question was sufficient to support the trial court's decision to give the instruction.

The defendant next contends that the trial court erred in refusing to give two non-IPI instructions. The first instruction stated as follows:

### "FEASIBILITY OF ALTERNATIVE DESIGN

There is no duty upon the manufacturer of the pneumatic nailer to manufacture the product with a different design, if the different design is not feasible. Feasibility includes not only elements of economy, effectiveness and practicality, but also technological possibilities under the state of the manufacturing art at the time the product was produced."

The second instruction stated:

### "MANUFACTURER AS INSURER OF SAFETY OF USERS OF PRODUCT

The defendant, Bostitch, division of Textron, Inc., was not,

at the time it manufactured and sold the subject pneumatic nailer, an insurer of the safety of the users thereof, nor was it the duty of the defendant \*\*\* to manufacture pneumatic nailers that were accident proof. It was the duty of [the defendant] to manufacture a product that was not unreasonably dangerous."

The trial court has considerable discretion in determining the form in which a jury instruction should be given. (*Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 872, 466 N.E.2d 1038.) Illinois Pattern Jury Instructions were devised to induce the use of instructions which are impartially prepared and free of argumentative language. (*Fravel v. Morenz* (1986), 151 Ill. App. 3d 42, 45, 502 N.E.2d 480.) Nonpattern instructions should not be used if pattern instructions correctly and adequately state the law. *Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 310, 562 N.E.2d 282.

In the case at bar, the trial court stated that the pattern jury instructions were sufficient to instruct the jury on all aspects of the case, including the issues the jury was to address and the burden placed upon the defendant to produce a reasonably safe product. The trial court determined that it would be inappropriate to burden the jury with additional written instructions. We believe that the court acted within its discretion in making that determination.

The defendant's final contention is that the trial court exceeded the discretionary and statutory limits governing witness and mileage fees. Although it appears from the parties' arguments that a hearing was held concerning fees, the defendant has neglected to include record cites to the hearing and its argument constitutes little more than a bare assertion that the trial court erred in determining the appropriate amount of fees. We have repeatedly stated the proposition that it is the duty of the appellant to provide an adequate basis for its contentions on appeal. (*Piper v. Moran's Enterprises* (1984), 121 Ill. App. 3d 644, 649, 459 N.E.2d 1382.) We do not believe that it is appropriate for this court to search the record in an attempt to find support for the defendant's contention that the trial court abused its discretion.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and HOFFMAN, JJ., concur.