STEVEN DUKES, Plaintiff-Appellant, v. J. I. CASE COMPANY, Defendant-Appellee and Third-Party Plaintiff (Illinois Power Company *et al.*, Third-Party Defendants).—STEVEN DUKES, Plaintiff, v. J. I. CASE COMPANY, Defendant and Third-Party Plaintiff-Appellee (McCartin-McAuliffe Plumbing & Heating, Inc., Third-Party Defendant-Appellant; Illinois Power Company, Third-Party Defendant).

Fourth District   Nos. 4—84—0557, 4—84—0584 cons.

Opinion filed October 10, 1985.—Rehearing denied November 6, 1985.

TRAPP, J., dissenting.

Phebus, Tummelson, Bryan & Knox, of Urbana (Joseph W. Phebus and Jeffrey W. Tock, of counsel), for appellant Steven Dukes.

Craig J. Causeman, of Thomas, Mamer & Haughey, of Champaign, for appellant McCartin-McAuliffe Plumbing & Heating, Inc.

Heyl, Royster, Voelker & Allen, of Urbana (James C. Kearns, of counsel), for appellee.

JUSTICE MORTHLAND delivered the opinion of the court:
This consolidated appeal stems from a products liability action filed by Steven Dukes against the J.I. Case Company, and the subsequent third-party contribution claims by J.I. Case against Dukes' employer, McCartin-McAuliffe Plumbing & Heating, Inc. (McCartin), and Illinois Power Company. The appeal raises questions concerning the viability of the theories under which Dukes sought to recover from J.I. Case and the theories under which J.I. Case sought to defend the claims, as well as the theories asserted by J.I. Case in its claim for contribution against McCartin and Illinois Power. In addition to raising fundamental questions concerning the various theories asserted below, the appeal also raises issues concerning trial court rulings on procedural and evidentiary matters.

The facts are prolix, but must be stated in order to support the discussion of the issues. Plaintiff was injured on December 1, 1978. He was employed by third-party defendant, McCartin, who had in turn been contracted to perform the installation of underground gas pipes by Illinois Power Company. The work site was in Danville. The job called for the plaintiff to drill a hole under a sidewalk for a distance of about 20 feet.

The drilling was to be accomplished through the use of a Case Fleetline No. 40 + 4 trencher, which was equipped with a hydra-borer attachment. The machine was sold to Illinois Power on or about October 13, 1972. The trencher is a multipurpose vehicle with a number of uses which are accomplished through the use of various attachments. The attachment at issue in this suit was the hydra-borer, which is a hydraulically powered device which can bore or auger small diameter holes under obstructions. The holes are drilled by attaching steel rods in 10- and 20-foot lengths to the basic machine while a drill bit is placed on the front of the rods. The hydra-borer provides the rotational force which screws the drill bit into the earth, while the Fleetline trencher itself provides the forward push which forces the rods through the earth under the obstruction. By adding sections of rod, the length of the bore can be extended. In addition to the hydra-borer, the trencher has an attachment which allows an operator to dig narrow tranches no more than one foot in width. The trencher can be used in conjunction with the hydra-borer to dig a trench which may be used to guide the direction of the auger rods in the course of the augering process.

Case also manufactures drill guides (positive level guide anchors). Drill guides are used to control the direction of the auger. If the drill guides are used, it is not necessary for a workman to manually control the direction of the auger. The drill guides are available as optional equipment and are not issued with the standard machine. Illinois Power Company, purchaser of the machine, did not purchase drill guides for this or any other Case trenchers they used. Illinois Power owned 142 Case trenchers with hydra-borer attachments on the date of plaintiff's accident.

Prior to purchasing hydra-borers and Case Fleetline trenchers, the tool which had been primarily used to accomplish similar tasks was the McLaughlin "MIGHTY MOLE" air-powered auger. McLaughlin issued operator's manuals with the Mighty Mole, and the manuals were found in Illinois Power equipment sheds. The operator's manual gave written instructions and warnings on the augering process. The warnings included admonitions against adjusting the auger

by hand, wearing loose clothing, and walking near a turning auger. McLaughlin also manufactured a tool which resembled a series of three J-shaped hooks, which was recommended for use in its augering procedures. Use of the J-hooks could also have precluded the necessity of a workman being in the trench with rotating drill rods. Illinois Power had a company-wide policy that the McLaughlin tool guides were to be used to guide augers, no matter whether a McLaughlin product or a Case product was being used in a given operation. Each Illinois Power crew had two McLaughlin tool guides available to it. The guides were also available to McCartin employees.

In conducting its augering operations, McCartin normally used a three-man crew, which included a lead man or bottom man, a hook man, and an operator. The lead man was in charge of the crew and had the responsibility of guiding the drill bit at the start of the augering process. The lead man was often in the trench and generally would attempt to control the direction of travel of the tip of the auger rod when it was initially tunnelling through the earth. Because the work crews recognized the danger of being in close proximity to turning drill rods, a plastic sleeve consisting of a three-inch-diameter, two-foot-long section of plastic pipe was often used to control the direction of the auger. McCartin procedures did not call for the use of the McLaughlin tool guide, and during the trial, plaintiff testified that he had never seen such a guide, but had often seen the plastic pipe in use.

The lead man's duty was to stay in the ditch until the direction of travel of the auger was no longer within his control, at which time he would exit the ditch. Witnesses for McCartin testified that the lead man was to signal the operator of the machine to stop the turning drill rods while the lead man climbed out of the ditch. Plaintiff, as well as his brother and cousin, all denied that there was such a rule.

The second member of the three-man crew was called the hook man. His duty was to stand approximately midway between the machine operator and the lead man with a hook with which he could hold the auger rods to attempt to minimize the flopping which the rods did as the length between the machine and the end of the drill bit increased. There was testimony that the hook man is sometimes called the lookout man, and one of his duties was to maintain eye contact at all times with the lead man, in order to relay the lead man's signals to shut down the machine in the event anything went wrong. Plaintiff testified that the hook man was not responsible for relaying signals from the lead man to the operator, although he did agree that constant eye contact was to be kept on the lead man by someone in the crew.

The third member of the three-man crew, the operator, had the responsibility of controlling the turning auger from his position astride the machine. From this position, the operator can look directly down the turning rod. His responsibility is to start and stop the machine, and in doing so he follows the signals of the lead man. The operator is generally able to see both the lead man and the hook man who are in his line of vision. The normal operating procedure was that while the lead man was in the trench the operator would run the machine at a very slow speed. If the operator should see the lead man leaving the ditch without signaling he was to stop the machine. If the hook man were to lose control of the rods, the operator was also to stop the machine. Plaintiff and various other witnesses contradicted this testimony and indicated that there was generally no rule about stopping the rods during various operations.

In addition to direct disputes about the various practices employed by McCartin employees during these operations, there was also contradictory testimony concerning the existence of safety meetings on the job. William Robertson, a foreman of McCartin testified that informal safety meetings were held on the job every morning. He stated he always tried to see to it that safety rules were enforced. Plaintiff, on the other hand, testified that he frequently saw safety rules being violated without comment or reprimand. He did state that Robertson would "raise hell" if he found someone starting the auger without using a plastic sleeve. Plaintiff testified that the plastic sleeve was infrequently used by McCartin employees, himself included. He also testified that to his knowledge, no one had ever been injured while guiding the augers at the start of the boring procedure. Plaintiff, his brother, and cousin, all testified that no one ever stopped the auger to get out of the trench.

There was extensive testimony concerning plaintiff's employment history with McCartin. He first went to work during the spring of 1977, and worked until McCartin shut down in the fall. He worked about half the time on the augering crew as a hook man. He returned to work with McCartin in the spring of 1978, and worked full-time on an augering crew, splitting his time between lead man and hook man about evenly.

Plaintiff testified that he was never given any real instructions as to how to do the job, but learned more or less by observation. He further testified that in his two years on the job, there had never been a safety meeting of any kind. Plaintiff stated that as a lead man he was aware that he was in charge of the crew. He stated that he was aware of only two rules that the lead man was to follow: (1) Use the

plastic sleeve to direct the drill rods without coming into contact with them; (2) do not wear gloves as they may catch on the drill rods. Plaintiff testified that he did not use the plastic sleeve with any frequency because in his opinion it was not useful.

Plaintiff further testified that he never stopped the drill rods when exiting the trench, and claimed he was never told to stop them at this time. He agreed it would be easy to do so and not inconvenient to the drilling process. Plaintiff's testimony was controverted by Robertson and other witnesses, who testified that they had told the plaintiff he was to stop the machine while exiting the ditch. Robertson added that plaintiff was aware of the reason for the rule, since plaintiff was aware that Robertson had been injured when his clothing had gotten tangled up with a drill rod. Plaintiff denied any knowledge of Robertson's injury.

Plaintiff recognized the fact that the degree of side-to-side movement of the rods is greater as one moved away from the front of the trench toward the machine. He testified that he was not aware that by brushing against the turning rods his clothing could become tangled, although this testimony was controverted by Robertson. Plaintiff also testified that he had never been told to tape his pant legs or avoid wearing loose clothing while in the trench.

Plaintiff testified that on the day of the accident his crew was beginning to drill a third hole under a sidewalk. He stated that on the first two occasions he neither used the plastic sleeve nor stopped the machine when leaving the ditch, and yet nothing was said to him about his actions. He further testified that on the first two drillings, William Robertson, his foreman, was directly above him and must have seen that he was not using the plastic sleeve, and did not stop the machine to get out of the trench. Robertson denied this. On cross-examination, plaintiff admitted stating in a previous deposition that he had no idea where Robertson was on the first two attempts, and during trial, admitted that the deposition testimony was correct. Plaintiff testified that he was wearing straight-leg jeans, while Robertson testified he was wearing bell-bottoms.

On the third drilling, Don Moulton, McCartin's equipment operator, was running the Fleetline trencher from its seat. He had his hand on the on/off lever, which allowed him to turn the auger off almost instantaneously. Moulton had an unobstructed view of both plaintiff and the hook man, Rick Hoover, who was midway between Moulton and the plaintiff. Moulton testified that the machine was operating at one-quarter throttle, which would result in about 26 revolutions per minute. Plaintiff was in the ditch with his back to Moulton and was

bending over the rod. He did not have the plastic sleeve but used his bare hands to control the rod. He gave a hand signal to start the auger. When the rod had entered the ground for a distance of about six feet, plaintiff straightened up, at which point it was clear that he was no longer guiding the rods. Plaintiff moved backwards several feet, watching his feet as he did so. He stated that he was trying to avoid contact with the rods but indicated he was doing this because he did not want to alter the direction of the auger. Moulton testified that the rods were not to be let go until it was no longer possible to change the direction of penetration. Plaintiff retreated from the front of the ditch for approximately six feet, at which time he put his hands on the sides of the trench and started to climb out. At this time, he was straddling the rod, which was in the center of the ditch. Moulton testified he would have been able to see if plaintiff had straightened up or if he had started to exit the ditch. He also stated that it was his duty to look for the lead man to begin exiting the ditch, and that if he had seen this, he would have stopped the machine immediately.

Plaintiff testified that about one minute elapsed from the time he let loose of the rod at the front of the ditch, and the time he eventually started to get out of the trench. He testified he put his hands and feet on the side of the ditch and started to climb the wall. As he was climbing, the rod began to bounce and caught his pant leg. He described the bounce as being of the type which occurred when a hook man lost control of the rods. Moulton testified he did not believe the hook man lost control, and said he would have stopped the machine if he had. The rods began to gradually pull plaintiff down into the ditch. He testified he began yelling at the top of his lungs, and continued yelling until the machine stopped. Moulton testified he thought he would have been able to hear plaintiff yelling, but that he did not hear anything. Moulton noted that even if he could not have heard plaintiff, the hook man, who was closer to the plaintiff, certainly could have.

The rod pulled plaintiff down into the ditch slowly, and tore off his pants, while tangling up his belt and sweatshirt. It was eventually necessary to use a knife to cut his belt and other clothing free from the auger rods. Plaintiff gave several estimates of the time it took him to be dragged to the bottom of the ditch, but admitted to having no really good idea of the time involved. Moulton testified that the instant he lost sight of the plaintiff, he immediately shut off the machine; however, plaintiff contradicted that, testifying that Moulton later told him he had shut down the machine because he had not seen plaintiff for a couple of minutes.

Plaintiff was taken to the hospital immediately following the accident and lost one testicle as a result of traumatic amputation. He also lost his scrotum, and some skin at the base of his penis.

At the hospital, he was treated by Dr. Randolph Hunter, a urologist from Danville. During treatment at the hospital, plastic surgery was used to replace the skin which had been taken from the base of his penis, and a small pouch was placed in his leg as a receptacle for the remaining testicle.

The plaintiff was released from the hospital at the end of December, and by mid-January, upon the advice of his doctor, engaged in sexual intercourse. He noticed pain in the area of the skin graft. Dr. Hunter testified that plaintiff's condition had improved considerably by May, and that should have made it easier to have intercourse. By May of the following year, the condition had improved to the point where Hunter was of the opinion that plaintiff's injuries should not have been causing him significant problems.

Tests made subsequent to the injury showed plaintiff's remaining testicle was no longer producing sperm, and that plaintiff was therefore sterile. Subsequent testing showed that the testicle was producing testosterone at an adequate level to place plaintiff in the mid-range of young adult males. Testosterone is the hormone which produces the ability to obtain and maintain an erection, and to engage in sexual activity, as well as being responsible for the presence of secondary sexual characteristics such as voice level and hair growth.

During trial plaintiff testified that his sex life was inadequate as far as he was concerned. The main problem was that he was having difficulty in maintaining long-term relationships with women because of the fact that he could no longer father children, and because of his perceived diminished sexual capacities.

Plaintiff put on the following proof of his monetary damages. Although his injury came toward the end of the work season, plaintiff had been previously employed by McCartin, and had long-term employment prospects with them. Due to his injuries, McCartin replaced plaintiff. His pay rate at the time of his injury was $10.40 per hour, plus fringe benefits. As a direct result of his injuries, plaintiff was unable to work 127 days. Plaintiff further testified that the psychological injuries were such that he did not work for an even greater period of time. Plaintiff sought compensation in the amount of lost wages of between $10,000 to $20,000. His total medical bills amounted to $11,676.47.

Two expert witnesses testified at trial. Plaintiff's expert was Carl Larson, a professor of mechanical engineering and the associate dean

of the College of Engineering at the University of Illinois. He testified that the dangers of rotating shafts such as drill rods, as well as the necessity to guard against injuries from the shafts are well known in the engineering community. In one treatise, the following passage is found: "The design engineer cannot assume the hazard posed by a mechanical mechanism will be obvious to the user, operator or observer of machine simply because it is obvious to its designer or a manufacturer." The same exhibit notes that a rotating shaft is almost always used to transmit power and that, if unguarded, the device frequently produces the traumatic amputation of the male genital organs. Larson testified that where a hazard is present, a designer's first obligation is to eliminate it. If it is not possible to eliminate the danger by design changes, the designer should construct a guard around the danger. Only where one cannot eliminate the hazard or guard against the hazard is it sufficient to merely warn of the hazard's existence.

Larson testified that in his opinion, the designer of a piece of machinery may not delegate to the purchaser or ultimate user, the requirement that they further equip or modify the machine to correct an unreasonably dangerous condition. He testified that where a 40 + 4 trencher was sold with a hydra-boring unit but without guide anchors, his opinion was that to a reasonable degree of engineering certainty, the machine was unreasonably dangerous for its reasonably foreseeable uses.

Larson also prepared a chart which demonstrated the relative cost of guide anchors compared to the cost of the 40 + 4 trencher. The exhibit shows the cost of furnishing two guide anchors with each machine would be in the range of .02% of the total sales price. He demonstrated designs for two types of guards which in his opinion were feasible and necessary to make a machine not unreasonably dangerous. The cost of the guards would have been in the vicinity of $50. Larson had no opinion as to whether other equipment, such as the McLaughlin tool guide which was available to plaintiff, made it possible to guide the auger rods without going into the trench. He finally testified that employees should not be permitted to work around moving mechanical equipment wearing loose-fitting clothing.

Case's expert witness, Joseph Lesher, testified that it was generally a dangerous practice for a workman to be in a two-foot-wide trench with a turning drill rod. His opinion was that it would be marginally dangerous if the trench was three feet wide. Lesher agreed that while drill guides were a feasible way to keep individuals out of the trench, he did not agree that it was foreseeable that without the

drill guides, individuals would be in the trench. Lesher contradicted Larson's testimony to the effect that use of the hydra-borer contemplated a man being found in a ditch with a turning auger, because it was his opinion that had the trench been dug by a trencher, which could dig a ditch no more than one foot wide, a man would not fit in the ditch, and therefore would not have been in close proximity to the turning rods. He noted, however, that there were no specifications for either a minimum or a maximum width of a ditch.

In the course of his testimony, Lesher also testified as to his opinion about the use of the two- to three-foot section of plastic pipe as a drill guide. He stated that in his opinion the pipe was not adequate and testified that Case made no equivalent device. In Larson's opinion the use of the short plastic sleeve would not render the machine no longer unreasonably dangerous but rather necessitated a workman being in the immediate vicinity of the rotating drill rod, and therefore exposed to danger.

John Ireland, director of gas operations for Illinois Power, testified that the plastic sleeve had been approved by Illinois Power in 1978. Prior to this time the McLaughlin drill guide had been the only tool which augering crews were to use in directing the turning drill rods. Use of the McLaughlin tool guide precluded the necessity of having employees in the trench while an auger was turning. This was true even if the trench was two feet wide. Until Illinois Power changed its rules to allow use of the plastic sleeve, it was a violation of safety rules to be in a trench with a turning auger. A similar rule was in effect when Case boring equipment was being used.

Jack Divan, an inspector for Illinois Power assigned to the McCartin job, described a method of adjusting the start of an auger while keeping clear of the auger by placing a spade in the ground between the workman and the rod, and adjusting the rods with some type of hook. The procedure called for stopping the auger while climbing in and out of the trench, taping one's pant legs, avoiding loose clothing, and never adjusting a turning auger by hand. Divan testified that this had been the procedure used by McCartin crews prior to the introduction of the plastic sleeve. In Divan's opinion, this procedure could be used by a person in the ditch while assuring comparative safety.

Both parties made numerous attempts to introduce evidence of other accidents involving use of the hydra-borer. William Robertson testified that he had been injured during an augering operation, although it was not established whether the injury occurred while Roberson was using a hydra-borer or some predecessor equipment. There was no evidence that the accident was ever brought to the at-

tention of Case. Plaintiff sought to additionally prove that Ernest Ralston had been injured while using a Case hydra-borer, but the court refused to allow evidence of this matter, since an action filed by Ralston after his injury had resulted in summary judgment being granted to Case. Plaintiff additionally sought to offer evidence of injury to various other employees, but the court refused to consider evidence on these matters.

At the close of all the evidence, the court directed a verdict in Case's favor on count II of plaintiff's amended complaint, which count alleged wilful and wanton misconduct, and sought punitive damages. Following jury deliberations, a verdict for the plaintiff and against the defendant, Case, in the amount of $148,750 was returned. The jury, in a split verdict form, found that plaintiff's total damages for which Case was responsible regardless of any comparative fault on plaintiff's part was $175,000. The jury additionally found that the plaintiff was 15% responsible for his injuries, based either on his assumption of risk of his injury or his misuse of the product. The jury additionally returned a verdict for Case and against McCartin on Case's claim for contribution, which found Case to be 47.05% responsible for plaintiff's accident while McCartin was 52.95% responsible.

While the posture of the parties in this appeal calls for the resolution of some similar matters, it is clear that the underlying issues are distinct. For this reason the various issues are set forth in two subsections. The first subsection relates to Dukes' claim against J.I. Case, and Case's affirmative defenses to these claims. The second subsection deals with Case's claim for contribution from McCartin.

I. DUKES v. J.I. CASE

In this appeal Dukes argues variously: The trial court erred in numerous rulings both prior to and during the trial; the trial court erred in allowing Case's affirmative defenses to be considered by the jury; and, the jury's verdict was so inadequate as to be against the manifest weight of the evidence as a matter of law.

A. Trial procedure. Dukes makes several arguments dealing with procedural matters and evidentiary rulings during trial. We turn to these matters.

1. Peremptory challenges.

Dukes argues that the trial court committed reversible error by granting him eight peremptory challenges while granting Case five, and each third-party defendant, three. His argument must fail since *voir dire* was not transcribed.

■■ ■ The burden of presenting an adequate record in support of

claims of error is upon appellants. (*Village of Hillside v. John Sexton Sand & Gravel Corp.* (1983), 113 Ill. App. 3d 807, 447 N.E.2d 1047.) Satisfying the burden is especially important here, since an appellant who claims error in *voir dire* will generally not be heard to complain unless it can be shown that an objectionable jury was forced upon the complaining party. (*People v. West* (1967), 80 Ill. App. 2d 59, 225 N.E.2d 397.) Here, the absence of a record precludes a reasoned determination that Dukes was prejudiced by the alleged disparate peremptory challenges awarded the sundry parties in this suit.

2. Evidence of other injuries.

Dukes sought to establish knowledge of the dangerous nature of the hydra-borer on Case's part by showing prior injuries to workers who were using the machine. He attempted to call Ernest Ralston, who was employed by McCartin, and was injured while he stood on an exposed rotating rod of a hydra-borer. It was brought to the trial court's attention that Ralston had filed suit, but that Davis Manufacturing (now J.I. Case Company) has been granted summary judgment, and this decision was affirmed in *Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497. The trial court refused to allow Dukes to introduce any testimony concerning the injury to Ralston based on the fact that Ralston ultimately lost his claim.

Dukes points out that Illinois Power was granted summary judgment because the trial court found that Ralston had assumed the risk of his injuries as a matter of law by jumping up and down on turning drill rods in an effort to force the drill point past subterranean obstacles. In Dukes' view, the underlying legal principle behind the decision in *Ralston* has been fundamentally changed by the supreme court's decision in *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197, where it was held that conduct by a plaintiff amounting to assumption of the risk would operate to reduce but not preclude recovery from the manufacturer of an unreasonably dangerous product. Dukes' argument is that the fact that Ralston suffered an adverse summary judgment in his suit was not a finding that Case did not manufacture an unreasonably dangerous product but rather that Ralston was precluded from recovering anything because of his behavior. Since a similarly situated, post-*Coney* plaintiff would not necessarily be precluded from recovery, Dukes concludes that the facts of Ralston should have been admitted into evidence and that the trial court erred in refusing to do so. Dukes goes on to point out that at least since *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, Illinois courts have recognized the admissibility of substantially similar, although not patently identical incidents, as they

bear on the showing that a product is unreasonably dangerous.

Case's general response to this line of argument is that the trial court did not err, because there was no showing of any substantial similarities between the accident to Ralston and the accident to Dukes and there was no showing of notice to Case of Ralston's injury. Case argues that Ralston was jumping up and down on rotating drill rods to force them past obstacles, which he admitted was an activity in which one should not be engaged. There, there was no indication that the absence of drill guides (which was the underlying factor leading to Dukes' allegation that the hydra-borer was sold as an unreasonably dangerous instrument) in any way affected Ralston's injuries, since there was no showing that the drill guides would have precluded Ralston from jumping up and down on the rods.

■■ ■ In our opinion, the manner in which Ralston was injured was not sufficiently similar to the manner in which Dukes was injured to support admission into evidence of the facts of Ralston's case. The evidence was properly excluded. It is well settled that a reviewing court, in affirming a decision of a trial court, may rely on any matters of record which support the decision below. Therefore, there was no error in the court's exclusion of the Ralston incident as it bore on Dukes' allegations that Case marketed an unreasonably dangerous product.

Dukes also sought to introduce, through stipulation, the facts surrounding a subsequent injury to Michael Cleveringa who, like Ralston was injured while standing on the turning rods of a hydra-borer. As the above discussion makes clear, we are not convinced that a person perched on the turning rods of a hydra-borer is in a substantially similar position to a person who is injured while exiting a ditch within which are turning hydra-borer rods. A substantially similar situation would seem to be a minimum requirement for the admissibility of subsequent occurrences, if such occurrences are admissible at all, a matter on which no Illinois court has yet ruled.

■■ We note that a few of our sister courts (see, e.g., *Ginnis v. Mapes Hotel Corp.* (1970), 86 Nev. 408, 470 P.2d 135) have admitted evidence of subsequent occurrences, insofar as the evidence bears on the dangerous nature of a given product. Even if we were convinced that this approach is appropriate, Dukes can show no prejudice in this matter since the jury, by its verdict, agreed with him that Case's product was unreasonably dangerous. Thus, there was no error in the exclusion of evidence of a subsequent occurrence.

3. Dismissal of claim for punitive damages.

Dukes' complaint was stated in two counts: the first sought com-

pensatory damages from Case for its marketing of an unreasonably unsafe product; the second sought punitive damages for its wilful and wanton conduct in marketing the same. At the close of all the evidence the trial court struck the second count. Dukes now argues that it was reversible error to refuse to allow the second count to go to the jury.

In this appeal, Dukes argues that the proper test to apply in deciding the viability of a claim for punitive damages in a products case is whether the manufacturer displayed a "spirit of utter indifference to whether the product might cause unnecessary injuries," and whether the indifference was flagrant. *Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 427 N.E.2d 608.

Case responds that the test to be applied in deciding the viability of a claim for punitive damages in a products case has several elements which include: the showing of notice to the manufacturer of a defect in his product, examination of the identity and abilities of the purchaser, the obvious nature of the danger, and, customs in the industry with reference to supplying safety devices. Case offers no citations in support of this test but goes on to argue that plaintiff's reliance on *Moore* is misplaced because the facts here are insufficient to show a flagrant or reckless disregard for the safety of the consumer of its products.

■ We agree with Dukes that the proper test in these matters is stated in *Moore,* but find that the facts adduced at trial were insufficient (which we note was the same result reached in *Moore*) to take count II to the jury. There was no evidence of any injury occurring to a worker similarly situated to Dukes. As previously discussed, two attempts at introducing examples of dissimilar occurrences were properly refused by the court. The only other incidence of injury was the testimony of William Robertson. His testimony failed to establish whether he was injured while using a Case product or while using a predecessor's equipment.

■ In his brief Dukes asserts that Case's expert witness admitted to knowing that Case was marketing an unreasonably hazardous instrument, an admission which, if true, would be properly attributable to Case. (See *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.) Our review of the record shows that Case's expert, Joseph Lesher, testified that it was generally dangerous for a workman to be in a narrow trench with a turning drill rod. While he agreed that the drill guides were a feasible way to keep individuals out of the trench, he was also of the opinion that drill guides would not necessarily preclude a workman from being in the danger zone. To our way

of thinking, this does not amount to an admission that he, or Case, knew of the likelihood that a workman would be injured by turning drill rods but consciously chose to disregard the risk in a manner showing utter indifference to whether the product might cause unnecessary injuries. As such, the evidence did not come up to the standard required by *Moore*, and Dukes' second count was properly stricken.

4. Closing arguments.

▇▇ Dukes argues that the trial court abused its discretion by allowing him only 40 minutes for closing argument, rather than the 60 minutes he requested, and further compounded this error by allowing the defendants 100 minutes total time for their closing arguments. Case responds *first*, that trial courts are imbued with broad discretion in allotting time for closing arguments, and *second*, that a cause may not be reversed on this ground unless a reviewing court is in a position to be thoroughly satisfied that the complaining party has been wronged (*Hansell-Elcock Foundry Co. v. Clark* (1905), 214 Ill. 399, 73 N.E. 787), a conclusion which may not be reached in this case since Dukes failed to have closing arguments transcribed.

We agree with Case that *Hansell* controls. Without a transcript we would simply be guessing as to whether Dukes' case was inadequately argued to the jury. This we will not do.

B. Case's affirmative defenses. Dukes argues that the trial court erred in not striking the portion of Case's answers alleging that Dukes misused the hydra-borer, and assumed the risk of his injuries. He goes on to argue that the error was compounded by the court's giving Case's proposed instructions on these issues. We agree.

1. Assumption of risk.

Dukes' pleadings alleged that the Case hydra-borer was an unreasonably dangerous product because it was not equipped with drill guides as original equipment. He alleged that without the presence of drill guides it was necessary for a workman to place himself in dangerous proximity to turning drill rods.

Case, in its answer, replied that Dukes had assumed the risk of his injuries by: voluntarily placing himself in close proximity to the moving drill stem despite his knowledge that this activity could cause his clothes to become entangled in the rods, failing to use a slotted plastic pipe to begin guiding the drill rods into the earth, and, failing to manually widen the ditch to allow him more room to work around the rotating drill rods.

In our opinion, none of these matters, whether sufficiently proved or not, are proper statements of the necessary elements of assumption of the risk which must be proved by a defendant in a strict prod-

ucts liability case predicated on a product made unreasonably unsafe due to the lack of safety devices.

Illinois adopted the theory of strict products liability in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182. Despite the supposedly absolute nature of a manufacturer's liability, courts continued to recognize that a user or consumer could not knowingly and voluntarily expose himself to risk created by the defect and still charge the manufacturer with the cost of his harm. One aspect of such consumer behavior has been termed assumption of the risk. In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 430, 261 N.E.2d 305, 312, the court noted that "the test to be applied in determining whether a user has assumed the risk of using a product known to be dangerously defective is fundamentally a subjective test, in the sense that it is *his* knowledge, understanding, and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person." The test is essentially two-pronged. The plaintiff must *know* the product is defective and while armed with this knowledge *use* the product.

We admit that instances of this nature are few. Two illustrative examples are found in our cases of *Kirby v. General Motors Corp.* (1973), 10 Ill. App. 3d 92, 293 N.E.2d 345, and *Auton v. Logan Landfill, Inc.* (1983), 121 Ill. App. 3d 724, 460 N.E.2d 3, *aff'd* (1985), 105 Ill. 2d 537, 475 N.E.2d 817. In *Kirby* the plaintiff was a truck driver who had numerous occasions to repair a faulty steering box in a truck which he had driven over 150,000 miles in an 18-month period. On at least two occasions he had lost complete steering control when the box came apart. On the day of the accident he lost steering control and again repaired the steering box three miles before the occurrence.

In *Auton*, the defendant alleged that plaintiff was injured by an earthmover which backed over him at a time when plaintiff knew a backup warning alarm was malfunctioning. In both cases we held that allegations of continuing consumer use of a machine while armed with the knowledge of a defect were sufficient to allow a defendant to allege that the plaintiff assumed the risk of his injuries.

■ With reference to Case's defense that Dukes assumed the risk of his injuries, none of their allegations were that Dukes was aware of the existence of drill guides, which would do away with the necessity of a workman getting in the ditch with the hydra-borer operating. As pointed out in *Williams*, the allegations must lead to the conclusion that the *plaintiff* knew the product was defective, in that it lacked a safety device, and that the *plaintiff* proceeded to use the product with such knowledge. The affirmative defense of the assumption of the risk

was not properly alleged nor proved, and the jury should not have been instructed on plaintiff's assumption of the risk.

We realize that there has been a great change in the laws since the early cases which defined assumption of the risk. The most fundamental change has been that our supreme court has changed the effect which a finding of assumption of the risk will have on the plaintiff's recovery in a strict products liability suit. In *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197, the court held that a plaintiff who has assumed the risk of his injuries in a products case may have his recovery reduced by the extent to which his assumption of the risk contributed to his injuries. This is quite different from the state of the law at the time of *Williams*. At that time, the plaintiff's conduct would have completely barred his recovery if he were found to have assumed the risk of his injury. Despite the fact that the effect of a finding of assumption of risk has changed, we are convinced that the definition has not, and find that the facts pleaded by Case were insufficient to allow the claim of assumption of risk to go to the jury.

2. Misuse.

■■■ Turning to Case's next affirmative defense, "misuse," we are of the opinion that it too should have been stricken, and should not have been the subject of an instruction. Case alleged that Dukes misused the hydra-borer, in that he brought himself into close proximity to rotating equipment, but did not use available protective devices. This allegation misconceives the nature of the defense of misuse. To properly prove product misuse, it must be shown that the product has been used for a *purpose*, neither intended nor foreseeable, not in a *manner* neither intended nor foreseeable. (See *William v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) There is no question but that Dukes was using the hydra-borer for its intended purpose and therefore, any allegations of misuse on his part must fail. The defense should therefore have been striken and the jury not instructed on it.

3. Comparative fault.

Case's final affirmative defense was labelled "comparative fault," and mirrored two of Case's prior claims under its affirmative defense of assumption of the risk: (1) Dukes failed to use the slotted plastic sleeve; and (2) he failed to expand the trench in which he was working. The count was removed from the jury's consideration, and Case now argues that this removal was error.

■■■ Since we have previously found that none of Case's allegations supported its theory that Dukes acted in a manner which might

properly be compared to Case's liability, we find also that a simple change of label from assumption of risk to comparative fault does nothing to elevate the facts pleaded in Case's third affirmative defense. We hold that none of Case's affirmative defenses were sufficiently pleaded or proved to allow their consideration by a jury, and that by allowing them to stand, and then instructing the jury on them, the trial court erred.

In a collateral argument, Dukes also points out that the jury was instructed that he was under a duty to exercise ordinary care for his own safety at the time of his injury. He claims giving the instruction was error. It was. In a strict products liability case, the plaintiff has no duty to prove his exercise of due care. (*Collins v. Musgrave* (1975), 28 Ill. App. 3d 307, 328 N.E.2d 649.) Since there is no duty to prove the exercise of due care, it was error to instruct the jury that such a duty was extant.

We turn now to the impact of the errors described above. Dukes argues that as a result of the trial court's errors, we must at least reverse the damages portion of the jury's verdict, and remand this cause for a new trial, and at most, reverse the entire verdict and remand for a new trial *de novo*. One of the benefits flowing from the adoption of comparative fault in the area of strict liability is that juries may now return a verdict, such as that in the instant case, which fixes the liabilities of the parties and sets damages in a bifurcated manner. Here, the jury found that Case had marketed an unreasonably unsafe product. They found that by virtue of the product's unreasonably unsafe nature, plaintiff was injured. His total damages were fixed at $175,000, but reduced by the dollar amount which equalled his contribution to his injuries. Our previous discussion has made clear that we are of the opinion that Case's allegations and proofs were insufficient to allow a jury to properly find that Dukes engages in any behavior which might be compared to Case's behavior in reducing Dukes' recovery. That fact notwithstanding, the errors had no bearing on the jury's original determination of Case's liability for marketing an unreasonably unsafe product, and therefore no trial on the issue of liability need be had. Similarly, the allegations bore solely on the dollar amount by which Dukes' verdict was rendered inadequate by virtue of being improperly reduced. Even assuming, *arguendo*, that the errors reflected on plaintiff's liability, we have held that *additur* is appropriate if trial errors affected only the plaintiff's recovery. (*Fraher v. Inocencio* (1984), 121 Ill. App. 3d 12, 459 N.E.2d 11.) Similarly, in cases where a verdict is inadequate due to the omission of some specific, definitely calculable item, the appropriate relief

to be granted by a reviewing court is an *additur*, providing defendant agrees to this remedy. (*Ross v. Cortes* (1981), 95 Ill. App. 3d 772, 420 N.E.2d 846.) Case, both in its brief and in oral arguments, sought such relief here. Since Case is agreeable to this remedy, we deem it prudent to adopt it. We, therefore affirm the judgment of the trial court, but modify it to reflect the amount determined as Case's full liability, disregarding all aspects of Dukes' contribution to his injuries.

II. J.I. CASE v. McCARTIN

The following portion of this opinion deals with the appeal of McCartin from that portion of the jury's verdict which found it to be over 50% responsible for Steven Dukes' injuries. McCartin's primary argument is that neither the facts pleaded nor the facts proved were sufficient to support Case's claim, and that therefore we should reverse the jury's verdict.

A. The basis of McCartin's liability. In Case's amended third-party complaint, it alleged three alternate theories under which it sought contribution from McCartin, should Case eventually be found liable to Dukes. *First*, Case alleged acts of negligence on McCartin's part. McCartin argues here that an employer's negligence, standing alone, cannot support contribution to the manufacturer of an unreasonably hazardous product. *Second*, Case recited a number of allegedly negligent acts committed by McCartin, which in Case's view, proved that McCartin was misusing the hydra-borer at the time of Dukes' injury, and therefore supported its claim for contribution. *Third*, Case recited a number of allegedly negligent acts committed by McCartin, which in Case's view, proved that McCartin assumed the risk of Dukes' injury, and again called for McCartin to contribute toward satisfaction of Case's liability. McCartin argues here that neither the allegations nor the proof were sufficient to show that McCartin either assumed the risk of Duke's injuries or misused the hydra-borer. We turn now to these arguments *seriatim*.

1. Negligence.

Count III of Case's amended third-party complaint alleged a number of acts including: inadequate training of plaintiff, inadequate safety instructions, failure to provide adequate safety equipment, failure to provide adequate safety rules, failure to enforce or follow existing safety rules, failure to keep watch on plaintiff in an effort to prevent or minimize possible injuries when plaintiff was in a known area of danger, and, failure to warn plaintiff that his clothes might become entangled in turning drill rods. Case then alleged: "That the foregoing acts of negligence were a direct and proximate cause of the injury

to STEVEN DUKES," and so sought contribution in an amount commensurate with McCartin's responsibilities for Dukes' injuries.

In this appeal, McCartin's position is that our supreme court, in a trilogy of recent cases, has precluded the possibility of a manufacturer of an unreasonably hazardous product receiving contribution from an employer of a plaintiff injured by the product based upon the employer's intervening negligent acts. In our view, McCartin is correct.

The supreme court first allowed contribution between an employer and a manufacturer in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437. The court was of the opinion that if "the manufacturer's third-party complaint alleges that the employer's misuse of the product or assumption of the risk of its use contributed to cause plaintiff's injuries, the manufacturer has stated a cause of action for contribution." (70 Ill. 2d 1, 15, 374 N.E.2d 437, 443.) This principle was reiterated in *Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, 374 N.E.2d 455, and *Robinson v. International Harvester Co.* (1977), 70 Ill. 2d 47, 374 N.E.2d 458. If the principles set forth in the *Skinner* trilogy were strictly applied to count III of Case's third-party complaint, the count would be fatally defective since it admittedly alleges only negligence on McCartin's part, and negligence is definitely an inadequate ground for contribution in a case such as this where a manufacturer is seeking contribution from a plaintiff's employer. Unfortunately, the "principle" expounded in the *Skinner* trilogy must be something less than ironclad because in each case the court went on to construe the third-party complaints (which were each admittedly couched in terms of the employer's negligence) as essentially alleging acts constituting assumption of risk or product misuse on the part of the employer. Because of this, we must apparently undertake an independent review of the facts alleged by Case to see if we can logically transform Case's complaint from allegations called negligence to allegations called either assumption of the risk or misuse of the product.

The facts of two of the cases in the *Skinner* trilogy are found in the appellate court opinions. See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1976), 40 Ill. App. 3d 99, 351 N.E.2d 405; *Stevens v. Silver Manufacturing Co.* (1976), 41 Ill. App. 3d 483, 355 N.E.2d 145.

In *Skinner*, the plaintiff was injured by an injection molding machine which was alleged to be defective and unreasonably unsafe by virtue of various defects in its design which included the absence of safety devices. The manufacturer denied plaintiff's allegations and sought contribution from the plaintiff's employer, alleging that the

employer had purchased and used what was known to be a poorly maintained secondhand machine, which had been rewired so that it was no longer in its original condition. The manufacturer additionally alleged that the employer allowed the machine to be operated with actual knowledge that the machine had been rewired to render safety devices inoperative and that the employer knowingly allowed the machine to be operated without safety guards which had been furnished with the machine at the time of its original sale.

In *Stevens*, the plaintiff was a mentally retarded and physically handicapped employee who was injured while operating a shredding machine. Plaintiff filed suit against the manufacturer of the machine alleging, *inter alia*: (1) The shredder lacked guards at the cutting edges of spiral knives; (2) the shredder's instructions were inadequate; (3) the shredder lacked controls which precluded an operator's hands from being in close proximity to the spiral knives; (4) the shredder lacked adequate cut-off and safety switches; and (5) the shredder lacked visible warnings. The manufacturer again answered with general denials and sought contribution from the employer alleging that the employer, having actual knowledge of the design and the purpose of the feeder end of the machine, failed to use reasonable care in allowing material to pile at that end, which caused plaintiff to feed the machine from the side. The manufacturer additionally alleged: The employer failed to adequately apprise its operators of a safe manner of feeding the machine; allowed operators to fold materials which were to be shredded by using the top of the machine itself, because the materials which had been sent for shredding were too large for the machine's capacity; knew of the machine's capacity but allowed this practice to continue; and that the employer had installed, but then removed, a protective device from the cutting end of the machine, and thereafter permitted a mentally retarded and physically handicapped person to operate the machine by feeding materials into it from an inappropriate position.

The plaintiff, in *Robinson*, was injured when the rear portion of an industrial truck raised off the ground and crushed him between the truck and a ceiling under which he was working. He filed suit alleging the unreasonably dangerous nature of the truck, in that it was not equipped with a protective canopy. The manufacturer filed a third-party complaint against plaintiff's employer alleging the employer failed to equip the truck with a protective canopy despite its prior determination that such a canopy was a necessary safety device, and its knowledge of the availability of such canopies.

Comparing the pleadings in *Skinner*, *Stevens*, and *Robinson*

to the pleadings in the case here, we are of the opinion that the facts pleaded here in count III (negligence) are insufficient to "essentially allege" assumption of the risk and/or product misuse.

The crux of the third-party complaint in *Skinner* was that the company purchased and put on-line a machine which it knew had been rewired in a way which made safety devices inoperative. No such allegations are made by Case here. The crux of the allegations in *Stevens* are that the employer had installed a safety device (thereby evidencing its knowledge of a dangerous potential of the machine) but had then allowed the device to be removed prior to plaintiff's injury. Again, no allegations of modification of the hydra-borer are present here.

The closest factual situation of the trilogy to that before us is found in *Robinson*. Both involve the failure of a manufacturer to equip a product with an existing safety device prior to sale. However, the manufacturer in *Robinson* alleged that the plaintiff's employer knew of the existence of a protective canopy, and knew that the canopy was necessary for the protection of the operator but nonetheless purchased the truck without a canopy in place, and then placed the vehicle into operation without installing a protective device of its own. Here, there were no allegations that McCartin had knowledge of the guide anchors, and knew that they were necessary to prevent a workman from being in the trench with turning auger rods. To our way of thinking, Case's allegations in count III may simply not be read as alleging either misuse or assumption of the risk, and count III should have been stricken.

2. Misuse.

■■■ An employer may be sued in contribution by a third-party manufacturer who was partially responsible for injuries suffered by a plaintiff when the conduct of the employer constituted misuse of the manufacturer's product. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792.) Here, count IV of Case's amended third-party complaint recited numerous acts of negligence which, it was alleged, amounted to misuse of the hydra-borer by McCartin, should Case be eventually found liable for Dukes' injuries. The allegations parallel those recited in count III. We have previously found that the allegations in count III were insufficient to be construed as alleging either product misuse or assumption of the risk. Since the allegations may not be read as alleging misuse, count IV of Case's third-party complaint was also insufficient, failed to state a cause of action for contribution, and should have been stricken.

3. Assumption of risk.

Count V of Case's amended third-party complaint recited the allegations of counts III and IV but added two facts. Count V added the facts that Illinois Power had provided McLaughlin tool guides (which allegedly would have prevented Dukes from being in the trench with turning drill rods), and that McCartin chose not to use the McLaughlin guides, but chose instead to utilize a plastic sleeve which necessitated an employee's presence in the trench. These facts were then alleged to have constituted McCartin's assumption of the risk of Dukes' injuries.

We reiterate that an employer may be sued in contribution by a third-party manufacturer who was partially responsible for injuries suffered by a plaintiff when the conduct of the employer constitutes assumption of the risk of plaintiff's injuries by the manufacturer's product. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792.) We find the allegations in count V were sufficient to show a state of facts, which if proved, demonstrated that McCartin assumed the risk of plaintiff's injury.

To resolve this issue, we turn again to the *Skinner* trilogy and examine the facts which our supreme court deemed were sufficient to state a cause of action for contribution based upon an employer's assumption of the risk of an employee's injury. First, *Skinner* is readily distinguishable based upon the allegations there of the employer's knowledge of the use of a secondhand piece of equipment which had been rewired to avoid the operation of safety devices. Surely, if an employer allows a product to be used when the employer knows that safety devices are not operational, the employer assumes the risk of potential injuries. *Stevens*, too, is readily distinguishable. In *Stevens* it was alleged that an employer had installed a guard, but removed it prior to the plaintiff's injury. Installation of a safety guard is a basis through which it may be inferred that an employer knows of the injury-causing potential of a product. If an employer knows of the injury-causing potential of a particular product, takes steps to rectify it, and then removes those steps after which an employee is injured, it surely follows that he had assumed the risk of the injury.

■■ Turning to the final case in the *Skinner* trilogy, our opinion is that the allegations here were sufficiently analogous to those in *Robinson* to be deemed as properly stating a cause of action for contribution. In *Robinson* the manufacturer alleged that the employer, armed with the knowledge that an industrial truck was likely to cause injury to an employee unless a protective canopy was installed, nonetheless chose to allow its employee to work on an unprotected truck.

Here, count V alleged that McCartin failed to warn Dukes of the possibility that his clothing might catch on the turning rods of a hydraborer even though it had prior knowledge of such a possibility. The complaint went on to allege a course of conduct (failure to use McLaughlin tool guides and a conscious choice to use a slotted plastic sleeve) which necessitated the presence of its employees in close proximity to the turning rods. These allegations were analogous to those in *Robinson,* and we are of the opinion that a cause of action for contribution was stated.

While we are convinced that Case's allegations were sufficient to state a cause of action for contribution, our inquiry is not ended there, because McCartin also argues that the proofs, as adduced at trial, totally failed to show that McCartin was aware of the dangers posed by a hydra-borer not equipped with drill guides. McCartin's argument is that since the proofs ultimately failed to support Case's claim, the trial court erred in allowing count V to go to the jury.

The most damning evidence adduced against McCartin in this case case from two of its employees, Donald Moulton and William Robertson. Moulton, in response to a leading question, testified that as an operator of the fleetline trencher, he would stop the hydra-borer rods when the lead man exited the trench because the lead man might get tangled up with the rods. William Robertson, a McCartin foreman, testified to one occasion when, while he was aboveground and leaning against rotating drill rods, a pair of coveralls he was wearing got tangled up in a rotating drill rod thereby injuring him. Robertson testified that among McCartin's safety rules were the requirements that a machine operator constantly keep eye contact with the man who is in the trench and that he stop the hydra-borer when the lead man exited the trench. Robertson also testified that the lead man was to use the slotted plastic sleeve when starting the machine. We note that much of Robertson's testimony was controverted by plaintiff, who produced evidence that there was little or no conscious effort to promote on-the-job safety by McCartin.

■■■ The question we must decide is whether the evidence shows that McCartin was aware of the unsafe nature of the hydra-borer, and knew of a means within its control whereby the machine could have been made safe, but decided to forego that opportunity, thereby assuming the risk that plaintiff would be injured in the manner known to the employer. We conclude that there is not enough evidence to allow the jury's verdict to stand.

While there was evidence that McCartin, through the incident involving its foreman, Robertson, knew of the possibility that a work-

man's clothing could become entangled in turning drill rods, there was no evidence to show that McCartin ever knew of the existence of the guide anchors, and armed with this knowledge chose to forego their usage. Although allegations such as those pleaded may support pleadings in cases of this nature, it is equally true that the allegations must be proved to support verdicts based on such pleadings. Here, there was simply no evidence to show that McCartin knew of a means whereby the hydra-borer could have been made safe but consciously chose to forego this course of action, and the jury's verdict simply cannot stand.

4. Contribution act.

■■■ In Case's brief before this court, much was made of the fact that since the *Skinner* trilogy of cases, the legislature had passed "An Act in relation to contribution among joint tortfeasors." (Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*) Case argues at length that the Act operates to sanction contribution actions based on the negligence of an employer who is sued by a manufacturer. We disagree.

Our opinion is that any such contentions were put to rest by the supreme court's decision in *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 461 N.E.2d 382, where the court unambiguously held that the Act is to be viewed as a codification of the *Skinner* doctrine. Since our view of the *Skinner* doctrine supports our holding in this case, the contribution act offers Case no shelter. To the extent that Case argues that *Skinner* and its progeny, as reflected by some language in *Doyle*, simply shows the way to an ever expanding class of contribution defendants, we can only say that if such is the case, the proper body from which to seek such expansion is the supreme court or the legislature.

B. Extraneous matters. McCartin complains that the trial court erred in allowing evidence of its safety practices after Dukes' injury to reach the jury. Our disposition of this portion of the appeal renders these arguments moot.

With reference to the action of Steven Dukes against J.I. Case Company, Case has heretofore agreed to an additur so that Dukes' judgment will be in the sum of $175,000. We remand this part of the case to the circuit court of Champaign County, and direct the circuit court to enter judgment in favor of Steven Dukes and against J.I. Case Company in the sum of $175,000.

With reference to the contribution claim of J.I. Case Company against McCartin-McAuliffe Plumbing & Heating, Inc., and the judgment entered by the circuit court of Champaign County in said cause, we reverse the circuit court of Champaign County, and remand the cause to said circuit court with directions that it enter judgment in

favor of third-party defendant, McCartin-McAuliffe Plumbing & Heating, Inc., and against third-party plaintiff, J.I. Case Company.

Affirmed in part as modified, reversed in part, and remanded with directions.

McCULLOUGH, J., concurs.

JUSTICE TRAPP, dissenting:

I would affirm the verdicts and judgments entered in the trial court. The perceptions of the jury in fixing the percentage of comparative fault of the parties are not contrary to the manifest weight of the evidence.

Upon the issue of "assumption of risk," the majority opinion finds that plaintiff had worked as a party of an auger crew for more than a year. Some, if not all, of the work was standing in a trench, apparently one foot wide, containing a power shaft driving an auger. The hazard and danger seem patent.

Plaintiff's testimony makes clear that he violated the known safety rules requiring the use of a length of plastic pipe preventing the contact of body or clothing with a turning shaft and that he knew that the foreman could "raise hell" if he worked without using the section of pipe in directing the auger. Nevertheless, he chose to work without it because he did not consider the pipe to be useful.

I perceive these admitted facts to come within the ambit of the subjective knowledge and understanding of the hazard which in *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 430, 261 N.E.2d 305, 312, was determined to be the test of whether there was an assumption of the risk.

There was also testimony that the operator of the machine should stop the auger when the leadman sought to leave the ditch. There is no claim that a signal was given to stop the auger as the plaintiff climbed out.

While plaintiff's testimony, and that of his witnesses, claims that there were no instructions or directions as to safety procedure, and while plaintiff professes he had no knowledge of the hazard afforded with the work, that evidence was substantially contradicted by other witnesses. It is the historic function of a jury to pass upon the credibility of the witnesses.

While it was the opinion of plaintiff's expert that any safety device which permitted the employee to be in the vicinity of the turning shaft was unreasonably dangerous, it does not appear that he

undertook to testify that the plastic pipe was valueless as a safety device, or that it would not forestall most, if not all, injuries from the turning shaft catching the employee's clothing. The evidence is that Illinois Power approved the use of the pipe sleeve in 1978 in its use of something over 100 similar auger machines, and there is no suggestion of injuries suffered by failure of such safety procedure.

We note that the *Lesher* opinion as an expert is not necessarily conclusive, for the jury is not required to accept the opinion of a particular expert, and this is particularly so where there are differing opinions of witnesses found qualified to testify.

I read the majority opinion to say that the evidence does not support the jury's verdict finding an assumption of the risk by where an employee admittedly violates known safety rules concerning patently hazardous work. A jury's determination of comparative fault arising from such violations is not contrary to the manifest weight of the evidence.

The principal opinion determines that the complaint for contribution filed by Case against McCartin adequately stated a cause of action upon the hypothesis of an assumption of the risk, but concludes that there was not sufficient evidence to show that McCartin was aware of the safety procedures through the use of "tool guides" or "hooks." It appears that the use of such devices would permit the operation of the auger without the necessity of a man being in the trench. Illinois Power appears to have rented, or otherwise have furnished, the auger machines to McCartin, and there is testimony that the system of "guides" was available to McCartin for use with the augers. There appears to be no evidence contradicting this testimony. With such a record I would again hold that the verdict of the jury cannot be said to be contrary to the manifest weight of the evidence.

For such reasons, I respectfully dissent.